## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In the Matter of M.D.M.R. Infant under the age of 6,

DANHOE ALEJANDRO MEDINA LUGO

Plaintiff/Petitioner v.

MARIA MILAGROS RAMIREZ PADILLA,

Defendant/Respondent.

……………………………./

## VERIFIED COMPLAINT AND PETITION FOR RETURN
## OF A MINOR CHILD TO VENEZUELA[1] AND WARRANT OF ARREST IN LEIU OF
## WRIT OF HABEOUS CORPUS

Plaintiff and Petitioner, DANHOE ALEJANDRO MEDINA LUGO ("Left Behind Parent," "LBP," "Father" or "Petitioner"), a citizen of Venezuela, brings this action against Defendant and Respondent, MARIA MILAGROS RAMIREZ PADILLA ("Defendant " or "Respondent," "Abducting Parent" ), seeking the prompt return of the parties' five-year-old son ("M.D.M.R." or "Child")[1] to his habitual residence in Venezuela.

### I.      INTRODUCTION

1.      This action is brought pursuant to the Convention on the Civil Aspects of

---

[1] In compliance with Fed.R.Civ.P. 5.2(a), only the initials of the Child are included in this Complaint/Petition and his name has been redacted from all exhibits. Also, only the Child's year of birth is disclosed. The month and date of birth have been redacted from the exhibits.

International Child Abduction (the "Hague Convention" or the "Convention"), 51 Fed. Reg. 10493

(1986), and the implementing legislation set forth in the International Child Abduction Remedies Act

("ICARA"), 42 U.S.C. §§ 11601-11610 (2011).   A copy of the Hague Convention is attached as **Exhibit**

**"A"**. The Hague Convention came into effect in the United States of America on January 1, 1997, and has been

ratified between and among other Contracting States, including the United States of America and Venezuela.

2.        The objects of the Hague Convention are:

**Article l(a):**      To secure the prompt return of children wrongfully removed to or

retained in any Contracting State; and

**Article 1(b):**      To ensure that rights of custody and of access under the law of one

Contracting State are effectively respected in other Contracting States. (Id.)

3.        The Child is under 6 years and is now wrongfully removed and retained from his

habitual residence of Venezuela to the United States, both Contracting States of the Hague

Convention.   The Child was wrongfully retained in the Middle District of Florida by Respondent,

without Petitioner's consent or acquiescence[2].

4.        The Hague Convention authorizes a federal district court to determine the

merits of a claim for the wrongful removal or retention of a child[3]. It does not, however, permit the

district court to consider the merits of any underlying custody dispute.[4]

---

[2] See Charalambous v. Charalambous, 627 F.3d 462, 465 (1st Cir. 2010) (A respondent opposing the return
of a child on the grounds of consent and/or acquiescence must prove that either exception applies by
preponderance of the evidence. See 42 U.S.C. §11603(e)(2)(B). citing Charalambous v. Charalambous, 627
F.3d 462 (1st Cir. 2010)

[3] Toren v. Toren, 191 F. 3d 23 (1999).

[4] Sec Morris v Morris, 55 F. Supp. 2d 1156, 1160 (D. Colo. 1999) (recognizing that "(p]ursuant to Article 19 of the
Convention, [this Court has] no power to pass on the merits of a custody claim"); Bouquet v. Ouzid, 225 F. Supp. 2d at
1340 ("The underlying premise ofthe Hague Convention is to that a child's place of habitual Residence is the place
where questions of custody and access arc best decided.").

**II.**                              **JURISDICTION & VENUE**

5.        This Court has jurisdiction over this case pursuant to 42 U.S.C. §1603(a) and 28 U.S.C. § 1331.

6.        Venue is proper in this Court pursuant to 42 U.S.C. § 11603[5] and 28 U.S.C.§ 1391(b) because, upon information and belief, the Child and Respondent, and of respondent's husband Julio Sarugo Navarro Sanchez in an apartment lease by the maternal grandmother, Norma Ramirez Padilla which is within the Orlando Division of the Middle District of Florida.

7.        The Child is being held illegally in the custody, confinement, or restraint by Respondent in the Middle District of Florida.

8.        The Child is presently in the State of Florida, County of Seminole.

9.        Petitioner has rights of custody of the Child within the meaning of Articles Three and Five of the Convention in that he is the biological father and legal father of the Child on the Child's birth certificate[6].

10.       Respondent wrongfully removed the Child from his habitual residence in Venezuela and subsequently wrongfully retained the Child in the United States within the meaning of Article Three of the Convention and has failed to return the Child to Petitioner.

11.       Petitioner has rights of custody of the Child within the meaning of Articles Three

---

[5] As has been stated by other courts addressing Hague cases, the Convention therefore authorizes a federal district court to determine the merits of the abduction claim but does not allow it to consider the merits of any underlying custody dispute. Morris v. Morris, 55 F. Supp. 2d 1156, 1160 (D. Colo. 1999)(recognizing that "[p]ursuant to Article 19 of the Convention, [this Court has] no power to pass on the merits of custody"); sec also Currier v. Currier, 845 F. Supp. 916 {D.N.H. 1994) citing Friedrich v.Friedrich, 983 F.2d 1396, 1399 (6thCir. 1993); Meredith v Meredith, 759 F.Supp. 1432, 1434 (D. Ariz. 1991). The court's role is not to make traditional custody decisions but to determine in what *jurisdiction* the children should be physically located so that the proper jurisdiction can make those custody decisions. Loos v. Manuel, 651 A.2d 1077 (N.J. Super. Ct. Ch. 1J1 v. 1994).

[6] The issue of rights of custody must be addressed under the law of Venezuela. Sec Pesin v. Rodriguez, 77 F. Supp. 2D 1277 (S.D. Fla. 199); Fumes v. Reeves, 362 F.3d 702 (11th Cir. 2004)·;

and Five of the Convention in that he is the biological father and acknowledged paternity of the Child on the Child's birth certificate.

### III.    STATUS OF PETITIONER, RESPONDENT, AND CHILD

12.    Petitioner and Respondent are the parents of the Child. Petitioner and Respondent were married on October 2, 2015, and later divorced on September 25, 2018. A copy of the Marriage certificate and Divorce Decree  and a translation thereof are attached as **Exhibit "B" and Exhibit "C".**

13.    The Child was born in 2017 in the City of Valencia, State of Carabobo in the Country of Venezuela. A copy of the Child's birth certificate and a translation thereof are attached as **Exhibit "D".**

14.    The Assembly National of The Republic Bolivarian of Venezuela Decree, Organic Law for the Protection of Children and Adolescents establishes the following articles:

> **Art. 347** (Definition of Parental Authority); art. **348** (Content of Parental Authority); art.349 (ownership and exercise of parental authority); **art.358** (Content of parenting responsibility); **art.359** (Exercise of parenting responsibility) and **art. 360** (measures on parenting responsibility).

Hereinafter it shall be referred to as Decree of Venezuela and a translation there of are attached as **Exhibit "E".**

**15.**    On September 25, 2018, the parties were divorced, Hereinafter it shall be referred to as "Decree of Venezuela." On May 28, 2021, the parties entered an agreed Child Support and Family Coexistence Regime (hereinafter "Child Custody Order" or "Order"), that was ratified and Ordered by the Bolivarian Republic of Venezuela, Judicial Power, 3rd Supreme Court of First

Instance of Mediation, Substantiation and Execution of the Protection of Children and Adolescents of the Judicial Circumscription of Carabobo State, Valencia. A copy of the Child Support and Coexistence Order and a translation thereof are attached as **Exhibit "F".**

16.     The Child Custody Order granted Father shared parental responsibility, a time-sharing schedule, and child support obligation.

17.     <u>The Child Custody Order established the child's residence</u>.    The Child's residence would primarily be with the Mother at Urbanizacion Sabana Larga, residencias Puerto Madero, piso 3, apto 3D, Prebo, Valencia, Estado Carabobo [Sabana Larga Urbanization, Puerto Madero residences, 3rd floor, apartment 3D, Prebo, Valencia, Carabobo State]. The Mother was also Ordered to provide her change of address to the father immediately.

18.     <u>The Child Custody Order established that the child support would be paid by the Father to the Mother</u>.    The Father was ordered to pay One Hundred Twenty-five U.S. Dollars (USD$125.00) in favor of the child M.D.M.R., in cash and/or, transfer via Zelle to the following email of the mother mariamilagrosrp93@hotmail.com, for which purpose the mother will sign a receipt if the child support is paid in cash.. (Please see **Exhibit "F"**).

19.     <u>The Child Custody Order established a family coexistence regime for the parents</u>.    The father would enjoy regular time sharing with the child in the following manner:

> "The father will be able to share a full weekend with his son **M.D.M.R.** every fortnight, picking him up at the maternal grandmother's address on Fridays at 4:00 p.m., and retaking him on Sundays at 6:30 p.m.; Authorizing the paternal grandmother and/or grandfather in the event that the parent is on hospital duty or in surgery that prevents

him/her from picking up or dropping off the child **M.D.M.R.** at the scheduled time. Concerning the Weekly Coexistence Regime, the parent may share with his son **M.D.M.R.** on <u>Tuesday and Thursday</u> of each week. This will be done in the following way: the week that the parent is entitled to share the cohabitation regime, the weekend will only be for Tuesday; the week that the parent does not have to share the weekend, the coexistence regime will correspond to <u>Tuesday and Thursday</u>, picking him up from the school where he is studying at the time of getting out and returning him home at 6:30 p.m. at the address where the maternal grandmother lives ..." The Father would also have time sharing for Holidays, School Breaks, Summer, Spring Break, Holy Week, Easter, Carnival holidays, Christmas and New Year holidays, and Birthdays.

20.      <u>The Child Custody Order established guidelines when the parent and Child would travel outside the Republic of Venezuela</u>.  The Order provided in part, the following:

"Prior agreement between the parents for their corresponding vacations, they can **AUTHORIZE** the departure of the country before the competent Court as long as they are aware of: Hotel or house where **M.D.M.R.** is going to spend the night, telephone number (Local and personal), daily make a video call with the parent, in case of traveling with the father and in the same way of traveling with the mother, the same guidelines must be followed. In the event that the father or mother wants or needs to travel inside or outside the country without the child, due to vacations, distraction or emergency, the other parent will assume his care on a provisional basis only and exclusively for the duration of the trip, allowing communication with the absent father or mother by any means of communication, likewise grandmothers will be allowed to have contact with Mathias, the trip that is made, IT   SHOULD   NOT   BE

UNDERSTOOD, NOR INTERPRETED, EXPRESSLY OR IMPLIED, of a Cession of Custody or abandonment of the exercise of Custody or Responsibility for Parenting or Parental authority and it may not be taken as evidence for any type of administrative or judicial action or proceeding, since the trip is for justified reasons prior agreement between both parents. It being understood that at the time of return or completion of the trip the child must be immediately reintegrated to the parent who exercises custody (mother) failure to do so implies an undue retention[7].

21.     On May 16, 2022, the Father in his application, he provides a detailed narrative of the events leading up to the wrongful removal and retention of Child and the events afterwards he took for the Child to be returned to Venezuela is habitual residence.  The application included a narrative letter by the LBP, permission to send voluntary return letter to the abducting parent, and authorization to release case information.  Please find attached as **Exhibit "G"**.

22.     The Respondent violated the Child Custody Order that obligated the abducting parent to seek expressed permission from the LBP and permission of the Court.

**23.     On January 14, 2021,** the Father filed a Complaint with Bolivarian Republic of Venezuela, Judicial Power, 3rd Supreme Court of First Instance of Mediation, Substantiation and Execution of the Protection of Children and Teenagers of the Judicial Circuit of Protection of Children

---

[7] In Giampaolo v. Erneta, 390 F.Supp.2d at 1278-80), the respondent removed the children from the country while she had permission to travel outside the country. For this reason, the removal of the child was not technically in violation of the petitioner's rights in that case. However, the Giampaolo Court concluded, and this Court agrees, that the father's permission is needed in order to authorize a change in the place where his child resides. Thus, the Gimpaolo petitioner's "rights of custody" were violated just as Petitioner's rights here were violated when the children were removed from the country. See also; Mendez-Lynch v. Pizzutello, No. 2:08-CV-0008-RWS, 2008 U.S. Dist. LEXIS 10507, at *7-8 n.2 (N.D. Ga. Feb. 13, 2008). See also, Giampaolo v. Erneta, 390 F. Supp. 2d 1269, 1279 (N.D. Ga. 2004) ("Courts in the Eleventh Circuit have found that 'in the absence of a ruling from a court in the country of habitual residence, a court should liberally find 'exercise' where a parent keeps or seeks to keep any sort of regular contact with his or her child.'") (quoting In re Cabrera, 323 F.Supp.2d 1303, 1312 (S.D. Fla. 2004)).
**London Borough of Southwark v. O'Connor**, No. 17-60109-CIV, 2018 U.S. Dist. LEXIS 113538, at *9 (S.D. Fla. July 6, 2018)

and Teenagers of the Judicial Circumscription of the Metropolitan Area of Caracas and National International Adoption, a Complaint alleging that he was in *Breach of his Custody* due to that the Respondent "illegally took" the Child "to a foreign county, without the consent a competent Court with jurisdiction or consent of Father, " who "exercised share custody of his son". A certified copy of the Complaint and a translation thereof are attached as **Exhibit "H"**.

24.     On **February 21, 2021**, Father filed a Notice of Wrongful Removal of the Child by the Mother. A certified copy of the Notice and a translation thereof arc attached as **Exhibit "I"**.

25.     On **February 14, 2022**, Father filed Complaint with Bolivarian Republic of Venezuela, Judicial Power, 3rd Supreme Court of First Instance of Mediation, Substantiation and Execution of the Protection of Children and Teenagers of the Judicial Circuit of Protection of Children and Teenagers of the Judicial Circumscription of the Metropolitan Area of Caracas and National International Adoption to open a case against the Mother for the wrongful removal and retention of the Child without the Father's permission and Breach of Custody Order. However, this cause of action remains pending. The Father suspects that the maternal grandmother might be the cause for the absurd delay. A certified copy of the Complaint and a translation thereof arc attached as **Exhibit "J"**.

26.     **On July 12, 2021 and December 12, 2022**, the Petitioner filed with Bolivarian Republic of Venezuela, Judicial Power, 3rd Supreme Court of First Instance of Mediation, Substantiation and Execution of the Protection of Children and Teenagers of the Judicial Circuit of Protection of Children and Teenagers of the Judicial Circumscription of the Metropolitan Area of Caracas and National International Adoption, a Complaint alleging that he was in Breach of his Custody due to that the Respondent "illegally took" the Child "to a foreign county, without the consent a competent Court with jurisdiction or consent of Father, " who "exercised share custody of his son".

8

A certified copy of the Complaints and a translation thereof are attached as **Exhibit "K" and "L".**

27.     The Respondent, Father and Child resided together from October 2, 2015, to on or about April 6, 2018.  The Mother remarried on August 20, 2021.  It is noteworthy to add that the Petitioner does not know the Respondent's current husband very well.  The few times, Petitioner had an opportunity to interact with Mother's current husband it was cordial and respectful.  Father has not seen any meaningful interactions between Respondent's current husband and Child, to make any determinations on the relationship between them.  Suffice to say that Father does not believe their existed a strong bond between Child and current Husband.

28.     The Respondent, Father, and Child resided together as a family from the date the Child was born in 2017 to April 2018.

29.     The Child benefited from a close relationship with the Petitioner's paternal grandparents, aunts, uncles, cousins, and longtime family friends that were surrogate family to the Petitioner and Child.

30.     Respondent's extended family also reside in Venezuela.

**31.**     Respondent nor Child did not experience any threats from the government, gangs, political operatives, or criminals.  The Mother maintains that she and the Child were victims of political threats.  However, she never told the Petitioner, friends, or extended family that the Child was in danger.  Any allegations of the Child in danger are untrue and self- serving.  The Mother lived a peaceful, secure, and normal life with the Child in Venezuela.  They were free to move about the country, travel outside of Venezuela, and have a day-to- day life free of threats of person or property. Respondent only family in Florida are distant relatives (asylees) of her current Husband that Child has no familial connection with.

32.     The Petitioner, Respondent and Child resided as a family unit from 2017 to April 2018 and shared in all the parental decision making for the Child.

33.     The Petitioner continued to have daily contact with the Child. The Petitioner would drop off and pick up the Child from swimming class and kindergarten. Furthermore, because of the Respondent's personal commitments, the Respondent would leave the Child in the Petitioner's sole care for days at a time, or however long she would be out of the local area or country of Venezuela.

34.     The Petitioner continued to share in the parental responsibilities of the Child and supported the Child financially.

35.     The Child and Respondent lived in a very comfortable home in Venezuela with her current husband.

36.     The Father has maintained his court ordered child support. On January 2022 the Mother changed her email address linked to her bank account, so the Father was unable to transfer his Court Ordered Child Support. It so happens that the child was removed from Venezuela in November 2021. In January 2022 and February 2022, the Father was not able to pay the Court ordered Child Support

37.     Because the Mother changed her email address, the child support paid via Zelle by the Father was undeliverable.

38.     It was not until approximately March of 2022 that the Mother provided a new email address, so the Father was able to continue paying his Court ordered child support. Despite the Mother's irresponsibility, wrongfully removing and retaining the Child, his almost non-existent contact with the Child, and not knowing the Child's whereabouts the Father continued to pay his child support because it is in the best interest of the Child.

10

39.    The Mother once again changed her email address in January 2023. The Petitioner is no longer able to make his child support payments because the Mother has refused to provide her new email to facilitate the child support made through Zelle payments.

40.    It is the Petitioner's reasonable belief that the purpose of her changing her email address was to hide and conceal her and the Child's whereabouts.

41.    Prior to the Respondents unlawful removal of the child from Venezuela the child attended a private school at "Centro de Educaccion Inicial Caspu". The cost of the private school for 2019-2021 school years was equally shared by the Petitioner and Respondent. The Father also paid the cost for school uniforms school supplies and extracurriculars. A copy of the Enrollment, School records, and paid tuition payments and a translation thereof are attached as **Exhibit "M"**.

42.    Petitioner was solely financially responsible for the Child's swimming classes.

43.    On November 30, 2022, the Mother confirmed that she, Child, and Respondent's current husband were somewhere in the United States. Respondent made a weak attempt to gaslight the Father that he had given consent. Father fervently denied any prior consent. A copy of the WhatsApp messages and a translation thereof are attached as **Exhibit "N"**.

44.    Mother states in the WhatsApp messages bravado states the Child has forgotten his Father and never asks for his Father. Please see **Exhibit "N"**.

45.    Prior to November 16, 2021, Petitioner exercised his parental rights and maintained an extremely close relationship with the Child. Indeed, Petitioner had significant time sharing, including overnights, as well as paid child support, Child's school expenses, clothing, and other support.

46.    Father has been proactive for the Child to return to Venezuela since his wrongful

11

removal and retention by the mother in or about November 16 2021[8].

47.     On May 16, 2022, 181 days/6months since the wrongful removal and retention of the Child, the Father initiated his Application to the United Central Authority for the Discharge of the Hague Convention on Civil Aspects of the International Child Abduction of 25 October 1980 (hereinafter "United Central Authority"). Please see attached **Exhibit "G"**.

**48.**     On November 16, 2022, the United States Department of State on behalf of the Father and the Republic of Venezuela sent to the Respondent a letter requesting that the Child be returned to Venezuela (hereinafter "Letter to Return") to resolve the issue of custody of the Child. A copy of the Letter to Return is attached as **Exhibit "O"**.

49.     The Mother sent her response to United Central Authority (hereinafter "Response" or "response"). The correspondence is dated November 29, 2022. It is unsure what date the United Central Authority received the Respondent's correspondence. A copy of the Response and a translation thereof are attached as **Exhibit "P"**.

50.     In the Response, the Mother admits to entering the United States illegally on November 20, 2021 "through the Southern border with Mexico, near Andrade, California," with the Child due to the "political persecution involving the government of Venezuela". Respondent also makes false accusations that she is a victim of "physical and psychological" abuse by Petitioner.

51.     The truth is that the Mother's family has used the corrupt legal system in Venezuela to her advantage against the Petitioner. What the Respondent fails to declare in her Response, that her Mother *is a Judge*[9] and that position carries a lot of weight to manipulate the system for

---

[8] The Father has a reasonable belief that the child was wrongfully retained and removed from Venezuela in November 2021. The Father strongly believes that the Respondent, current husband, and Child, traveled into Mexico illegally, then crossed the Mexican – United States border on November 20, 2021.correspondence is attached as **Exhibit "N"**.

[9] The municipality where the original divorce and following Complaints filed are in the *in the same municipality in*

themselves.

52.     The Respondent states in her Response that "It is no secret that corruption in Venezuela is so entrenched that any judge or public official can be bribed with money and even more so if there are also political ties".

53.     The Mother emphasizes in her Response that "Mr. Medina Lugo has used all his economic and political power to prevent me from being granted underlined custody of Mathias Daniel." This statement is proof positive that Father was exercising his rights of custody and any allegations she made against the Father were to put a legal barrier between the Father and Child. The purpose of this Court is not to make custody decisions, rather to determine if Respondent wrongfully removed and retained the Child from Venezuela and brought the Child to the United States, that Respondent breached Petitioner's custody rights and expressly violated a court order granting Petitioner custody rights of the Child, that left behind parent **was** exercising his custody rights and none of the narrow exceptions to mandatory return under the Convention applies.

54.     The Mother has a history of leaving the county of Venezuela, without the Father knowledge. The court record in Venezuela is void of any requests made by the Mother to remove the Child temporarily for a vacation or otherwise, as required in the Custody Order.

55.     On more than one occasion, the Mother has conjured up accusations to put the Father in a bad light. One instance is when the Mother traveled to the United States for a wedding without the Father's knowledge. It was during the Father's time sharing; Father wanted to return the Child as the time-sharing schedule dictated, and when he attempted to deliver the Child to the maternal grandmother, he was told he could not return the Child because Mother had not returned from her trip. The Father left the grandmother's residence with the Child. During the following week, the day

---

*Venezuela* where the grandmother has held her judicial position.

the Respondent returned from her trip she filed a Complaint against the Father for wrongful retention. The Court asked the Father to return the Child to the Mother.  The Child was never in danger to not be returned to the Mother or resume the regular time-sharing schedule.  The Mother's ease of using the Court system is due to close family ties in the Court system  and  connections  (as  her mother is a Judge  in  Venezuela).

56.      In Venezuela the Mother was a successful  entrepreneur that had launched her own enterprise.  Her enterprise was to sell high end products to the elite class of Venezuela.  Beginning 2015 the Mother established her brand, MiMI' s shop , C.A.   The Mother had a brick-and-mortar store with employees; her success was undeniable.  The Mother current Husband worked for city hall as an accountant.  He left that employment for another prestigious position as a warehouse manager. Their combined income allowed them to live a lifestyle that was very comfortable.  In addition, the Mother and Child resided in a home that was purchased by the maternal grandmother and gifted to the Respondent.  The Respondent did not have any financial responsibilities for the home, other than regular upkeep.   Therefore, the Respondent and Child had the advantage of living in a home without having to pay rent or a mortgage, two ample incomes, and the Father's child support and medical insurance paid by Father.

57.      Through the maternal grandmother's connections to the legal system, Respondent was able to gain favor to exclude Petitioner from the Child's life. The evidence shows that her legal campaign was not achieving her ultimate goals fast enough.  Thus, illegally entering the United States, a criminal act,  and removing and retaining the Child in the United States was the risk she was willing to take to violate the Father's parental rights.

58.      The Father is a new Orthopedic surgeon that works in the government hospitals.  The Father, though he has a distinguished education and a promising career in medicine,

he has no *political* influence. In fact, the Petitioner has no influence, no ties to the government, other than a underpaid and overworked employee, and does not benefit from special privileges.

59.    The parties appear to have custody issues since the entry of the divorce decree and had presented themselves on several occasions *to the Court's in Venezuela* to resolve those issues.

60.    Though the Mother alleges she filed a Complaint against the Father for neglect against the Child. The truth is the Child received a scratch on his knee while playing at the playground, the Court did not find the mother credible; Child was not removed from Father's custody and the matter was ultimately dismissed. It was recommended that both parents to attend family counseling and to ensure the integrity of the child's health and both parents remain in constant communication with each other.

61.    What is remarkable, are the Mother's numerous filed Complaints about the Father as it relates to the Child and the rapid responses by the Protection Council Nino, Nina, and adolescents (equivalent to Department of Children and Families). The Complaints and corresponding Orders are in Mother's favor and entered by person's that grandmother had influence over.

62.    The Respondent's Response does not rise to an affirmative defense, wherein credible evidence exists that will negate her wrongful removal and retention from Venezuela against the Petitioner's rights of custody.

63.    As set forth, hereinbelow, Respondent wrongfully removed the child and thereafter wrongfully retained the child on or about November of 2021 within the meaning of Article 3 of the convention (see **Exhibit "A"**) and continues to wrongfully retain the child in the state of Florida, United States, in violation of Article 3, despite Petitioner's efforts to have the child returned to Venezuela.

## IV.    FACTUAL ALLEGATIONS OF CHILD
## PRESENCE IN THE UNITED STATES

64.      In or around the second week of September 2021, Respondent asked Petitioner for travel permission to take the minor child to the United States, through the Mexican border. The Father denied the mother's request. The Father never provided any written or oral consent for the child to be removed or retained in the United States.  A copy of the WhatsApp messages and a translation thereof are attached as **Exhibit "N"**.

65.      The Respondent and Child had valid passports.  The Mother's United States VISA had expired.  The Child did not have a VISA to enter the United States.  Unbeknownst by the Father, Respondent made a request for an American Visa for Child through the US Embassy in Colombia.  It was denied because she had no written consent or permission from the Father. Please see **Exhibit "Q"**.

66.      Because the Mother's clandestine plan was foiled, in the Mother's frenzy to remove the Child and create pressure on the Father to give his consent, she threatened the Father that if he did not give his written consent/permission for the Child to travel across the Mexican border illegally to the United States with the Mother, she would ask the Venezuelan Court's for sole custody and/or permission to travel with Child and force him to consent for a United States VISA. The mother never made a formal request to any Court in Venezuela. Please see **Exhibit "N"**.

67.      November 16, 2021 was the last time the Father saw the child during his ordered regular timesharing. The Father delivered the Child to school and then picked him up. When the child and father arrived at the Mother's doorstep at 6:30pm, the Child turned around and gave his father his face mask saying, "so you don't forget me".  At the time, the Father thought how sweet and tender his son was, took a video and went on his way.  It is impossible to know, what the Child knew, or had

gleaned from conversations he overheard that he would not see his father again.

68.     Once the Mother arrived in the United States, after 10 days arriving to the United States, she communicated with the Father via WhatsApp. A copy of the communications and a translation thereof are attached as **Exhibit "N"**.

69.     The Father unequivocally and continuously denied her request to the removal and retention of the Child. Petitioner has never acquiesced or consented to have the Child live outside of Venezuela.

70.     The Respondent in her Response admits to her deceptive removal and wrongful retention of the Child occurred on or about November 20, 2021 (day on which the defendant, in a clandestine manner, illegally crossed the border of Mexico into the United States). Please see **Exhibit "P".**

71.     <u>Upon information and belief, without informing Petitioner;</u> Respondent traveled with the Child and her current husband to the United States and Mexican border, a wantonly treacherous trek across desert and the Colorado River. The Respondent acted not only contrary to the best interest of the minor child, but opposite of good and reasonable judgement.

72.     <u>Upon information and belief, without informing Petitioner;</u> on November 18, 2021, Respondent, Child, and current husband started her trek to Mexico, then the United States. The Mother previously told the LBP that her current husband was in contact with person's that illegally move people from Venezuela into the United States for a fee. Of course, these persons are affiliated with gangs, human traffickers, sex workers, and drug smugglers. It is believed that Mother began the trek to cross the border into Columbia illegally, then traveled to Mexico. In Mexico she made her way to the Mexican – United States, then walked across the border into California. It is reasonable

to believe that because the Respondent and Child did not have a VISA to travel into any country in South, Central, or North America, that she paid for the assistance by criminals with the help of Respondent's family to finance her journey to Mexico, United States, and Florida.

73.     The Respondent and Child then traveled to Florida from California. It is unknown the manner, conditions, or path taken to arrive to Central Florida.  However, without a valid U.S. identification and very limited financial resources the journey was not without difficulties, challenges, and trauma to the Child.  More significantly, the Child suffered greatly by the abducting parent; the child travel through 4 time zones, anxiety of a Child with the sudden extraordinary changes, new country, language, culture, and personal insecurity was traumatic for the Child.

74.     <u>Upon information and belief, without informing Petitioner</u>; the Respondent and Child, without the expressed or implied consent of the Petitioner, traveled in a well-planned clandestine manner to the border of  Mexico and the United States with the assistance of known criminals.

75.     <u>Upon information and belief, without informing Petitioner</u>; the Respondent *exposed* the 4-year-old Child to a very dangerous criminal element, including but not limited to, coyotes, violence, cartels, organ traffickers and human-sex-child trafficking, and real threat of sexual abuse, as well as multitude of  health risks, including but not limited to, the current COVID-19 pandemic, hepatitis, malaria, sexual transmitted disease, and mal-nutrition, heat exhaustion and dehydration, that can lead to coma or death.

76.     <u>Upon information and belief, without informing Petitioner</u>; the Respondent admits that Mother along with the Child crossed the Colorado River (near Andrade California) at the Mexican and United States border.  The Respondent intentionally placed the minor 4-year-old Child

in grave danger of being a *victim* of rape, human - sex - child trafficking, emotional abuse, physical and emotional neglect, and death by homicide or drowning. It is well known that children that illegally cross the border suffer physical and emotional problems, due to the strain of traveling under very difficult and dangerous conditions that can affect the child into the future indefinitely.

77.     Respondent has never returned the Child to his habitual residence. Subsequently, Respondent has refused all of Petitioner's requests that she return the Child to his habitual residence in Venezuela.

78.     Upon information and belief, since relocating to Florida, Respondent has permitted the Left Behind Parent very limited access to the Child, via video call or cell. Communication with the Child has been sparse, monitored and only at Respondent's discretion.

79.     Upon information and belief, Respondent has hidden the Child from Petitioner. In fact, the Left Behind Parent was forced to use numerous methods to find the address of the Respondent and Child.  It was serendipity that an acquaintance of the Father saw the Mother and Child and he was able to glean the abducting parent's address.

80.     Father has not provided his written or verbal consent for the Child to remain in Florida, nor can his verbal, non-verbal actions or inactions be interpreted to be acquiescent that Respondent has Petitioner's consent to allow the relocation of the Child.

81.     Due to the Respondent's concealment of the Child, the Petitioner has had to secure extraordinary measures (and a bit of luck)  to gain the information necessary to locate the Respondent and Child and to communicate his continued wish that the Child return to Venezuela. The Respondent has cut off all communication with the Father via social media, cell phone, WhatsApp, and any other electronic means of communication for long periods of time not allowing regular and effective communication.

82.      From the time the Petitioner became aware of the wrongful removal and retention of the child, it has only been 14 months. Petitioner has been working diligently and continuous, since November 2021, to do everything possible for the Child to return to Venezuela.

83.      Petitioner was and continues to be a citizen of and located in Venezuela.

## V.                                      THE CONVENTION AND ACT

84.      A decision under the Convention is not a determination of the custody of the minor child pursuant to Article 19 of the Convention and 42 U.S.C. §11601(d)(4)[10].

85.      The Court must return the Child to Venezuela, because under the Convention and the Act, a preponderance of the evidence establishes that: **(I)** Venezuela was the habitual residence of the Child from his birth until November 18, 2021, when Respondent wrongfully removed him from Venezuela and brought him to the United States;

**(2)** Respondent's wrongful removal of the Child from Venezuela breached Petitioner's custody rights under Venezuela law and expressly violated a court order granting Petitioner custody of the Child; **(3)** Petitioner was exercising his custody rights under the laws of Venezuela at the time Respondent wrongfully removed the Child from Venezuela; and **(4)** none of the narrow exceptions to mandatory return under the Convention applies.

86.      It has been 14 months since the Mother wrongfully removed and retained the Child. Petitioner has been working diligently and continuous since November 2021 to do everything possible to find the Child's location and for the Child to return to Venezuela. The Respondent and Child were on a trek across the United States starting at Andrade, California to Central Florida. It was an overwhelming assignment to locate persons somewhere in the United States that are undocumented,

---

[10] This Court must apply the substantive law of the Convention. 42 U.S.C. § I 1603(d) (1995).

traveling with gangs and traffickers, buses, and possibly under false names. It has been 260/8 months since the father started the international process to return the Child through the Hague Convention. It is well understood that it is an arduous process to collect the required documentation, locate the Child in another country, and begin the application process. The Child is <u>not</u> well settled in the United States, State of Florida, or Seminole County.

### A. Habitual Residence of The Child Immediately before his Wrongful Removal from Venezuela

87.     Venezuela was the habitual residence of the Child immediately before his wrongful removal. The Child was born and lived in Venezuela until his wrongful removal by the Mother in November 2021. A determination of a child's habitual residence for purposes of the Convention "must focus on the child and ... the parents' present, shared intentions regarding their child's presence there . . . Where there is no shared or settled parental intent, a prior habitual residence should not be considered to be abandoned unless the objective facts point unequivocally to such a conclusion. <u>Bocquet v. Ouzid</u>, 225 F. Supp. 2d at 1343-1344 (internal quotation marks and citations omitted). See also <u>Ahumada Cabrera</u>, 323 F. Supp. 2d at 1311 (" [b]ecause the Convention tries to prevent one parent from unilaterally determining the country in which the child will live, the habitual residence of the child cannot be shifted without mutual agreement").

88.     The Respondent, Child and Father resided together from, on or about, February 2017 to April 2018 at Urbanizacion Sabana Larga, residencias Puerto Madero, piso 3, apto 3D, Prebo, Valencia, Estado Carabobo [Sabana Larga Urbanization, Puerto Madero residences, 3rd floor, apartment 3D, Prebo, Valencia, Carabobo State]. Hereinafter referred to as " Sabana Larga Residence". The Child was born February 2017, while the Father and Mother resided together and continued to reside together as a family till April 2018.

89.     Factors courts have looked to in determining habitual residence include the place a child was born and raised, attended school, and has a majority of his family. See, Bocquet, 225 F. Supp. 2dat 1311. In addition to the Divorce Decree and Child Custody Order, the attached **Exhibits "C" and "F",** birth certificate **(Exhibit "D")** and pre-school registration of the Child **(Exhibit "N")**, substantially demonstrate that Venezuela was the habitual residence of the Child before his wrongful removal. These documents show that the Child was born in Venezuela and was attending school and receiving extracurricular classes appropriate for his age, such as, swimming classes in Venezuela. Additionally, there is no evidence of Father's consent to allow the removal and retention in the United States. In fact, the evidence demonstrates that LBP denied consent for the Child to be permanently removed from Venezuela temporarily or permanently and to be subject to handicaps of having a status of illegal alien. Mother cannot produce not one scintilla of evidence that purports otherwise. The documents the Father has produced demonstrate the Child's enrollment and attendance in school and extracurricular activities show that Venezuela was the habitual residence of the Child, Petitioner, and Respondent. There is no evidence of any intent to change the habitual residence of the Child.

90.     The Child, Respondent, and current Husband resided at the Sabana Larga Residence. In Venezuela the Mother was a successful entrepreneur that had established her own enterprise. Her enterprise was a success and lucrative, by selling high end products to the wealthiest people in Venezuela it gained her access to people with connections in the government. The Mother current Husband worked for city hall as an accountant. He left that employment for another prestigious position as a warehouse manager. Their combined income allowed them to live a lifestyle that was comfortable. In addition, the Mother and Child resided in a home that was purchased by the maternal grandmother and gifted to the Respondent. The Respondent did not have any financial

responsibilities for the home, other than regular upkeep.   Therefore, the Respondent and Child had the advantage of living in a home without having to pay rent or a mortgage, two ample incomes, and the Father's child support.   The Respondent and Child were not in danger of being displaced.   In conclusion, their economic situation was very comfortable for Venezuelan standards, and they enjoyed many comforts that are not affordable in the United States, for example, a maid, nanny, and driver (as needed).

91.      The Child continues to be a citizen of the Republic of Venezuela.  The Child has never resided outside the Republic of Venezuela.  The Child had never traveled outside the Republic of Venezuela.

92.      The  Child,  Petitioner,  Respondent,  and  Respondent's  current  Husband  had established  a  day  to  day  stable  and  secure  regimen  for  the  Child  to  include  shared  parental responsibilities, home of child, time sharing schedule, education, extracurriculars, enjoyment of close extended family ties, financial support, health insurance, as well, as emotional support. See, Bocguet, 225 F. Supp. 2d at 1344 (France was the habitual residence of a child where he had spent the vast majority of his life there, had attended pre-school there, and there was no settled parental intent to leave France because one parent had a three-year apartment lease and the other had applied for a  temporary  residency  permit).  Moreover,  most  of  the  relatives  of  the  Child,  including  her maternal grandmother, paternal grandmother and a number of aunts, uncles, and cousins live in Venezuela.  In contrast, the Child and Mother have a very limited support system in the United States.  The only support the Child has, is his stepfather, who has no legal obligation to the Child and can provide no real economic support due to his own tenuous legal status in the United States.

93.      Accordingly,  Petitioner  has  clearly  established  a  prima  facie  case  of  wrongful removal and retention under the Convention.

**B. Respondent's wrongful removal of the Child from Venezuela breached Petitioner's custody rights under Venezuela law and expressly violated a court order granting Petitioner custody of the Child.**

94.     At the time of Respondent's wrongful removal and retention of the Child, the Father and Mother shared custody rights under Laws of Venezuela. Article 3 of the Convention provides that Laws of Venezuela determines the issue or custody in this case. See also Hanley, 485 F.3d at 645 ("existence of rights of custody are determined by the law of the country in which the child habitually resides at the time of removal."). Father unequivocally had custody rights pursuant to The Assembly National of The Republic Bolivarian of Venezuela Decree, Organic Law for the Protection of Children and Adolescents, **art. 347** (Definition of Parental Authority); **art. 348** (Content of Parental Authority); **art.349** (ownership and exercise of parental authority); **art.358** (Content of parenting responsibility); **art.359** (Exercise of parenting responsibility) and art.360 (Measures on parenting responsibility).

95.     In addition, the Child Custody Order unequivocally established the Father's rights of custody of the Child. LBP has never relinquished or waived these rights and the Orders have never been modified or reversed.

96.     Respondent kidnapped the Child to the United States. Respondent's removal and her continuing retention of the Child in the United States violates the Divorce Decree and Custody Order. Father has made many emotional pleas to the Mother of his clear and reasonably desire for Child to return to Venezuela so that he can exercise his custody rights. Respondent has denied the Father's request. Respondent's actions are an ongoing violation of the Father custody rights under the Laws of Venezuela. A copy of the text WhatsApp and Instagram messages is attached as **Exhibit "N"**.

**C. Petitioner was exercising his custody rights under the laws of Venezuela at the time Respondent wrongfully removed the Child from Venezuela**

92.      There was a very strong Father-son bound.  The Child is the Father's only Child and his sole purpose is to provide the Child every advantage available to him.  The Father not only exercised his time sharing scheduled as Ordered but would also have extra time sharing when the Mother would allow it. Indeed, Petitioner had significant time sharing, including overnights, as well as paid child support, Child's school expenses, clothing, and other support.  The Father would pick of the Child from school, involved in the academics of the Child, including but not limited to choosing the Child's school, had frequent video calls with the Child, maintained health insurance and was financially responsible for swimming classes.

93.      Not only did the father nurture and maintain a strong Father – Child bound, but also anticipated and filled of his needs. Father, among other things, provided for his school uniforms, extracurricular expenses, education, companionship and health care from the time of his birth and continues to maintain the Child's healthcare despite his wrongful removal and retention from Venezuela.

94.      Both parents shared in the responsibility and caring for the Child on a day-to-day basis. The facts are abundantly clear that the LBP never failed to exercise his custody rights or unequivocal abandonment of the child." Bocguet, 225 F. Supp. 2d at I 346.  Father's conduct supports the complete opposite conclusion.

95.      Even though the Mother ultimate goal was to cut the Father out of the Child's life, he did not allow any of the Mother's charades keep him from the Child.  The Father maintained his Court Order time sharing schedule and sought out additional time with the Child when the Mother would allow it.  The Mother's tactics to alienate the Child from the Father with frivolous, exaggerated,

and untrue complaints are not a new phenomenon.   However, here in this situation, the stakes are higher.  The facts show that the Mother wrongfully removed and retained Child to use the American Judicial system to achieve and advance her illegitimate goals.

## VI.   NO   AFFIRMATIVE   DEFENSES   ARE   AVAILABLE   TO RESPONDENT

96.     Once the Court determines that a child's removal was wrongful, it must order the prompt return of the child unless the respondent establishes one of the Convention's limited affirmative defenses. Convention, art. 12-13, 20; <u>Baran v. Beaty</u>. 526 F.3d 1340, 1344 (11th Cir.

2008). The enumerated defenses "are to be narrowly construed to effectuate the purposes of the convention and, even if proven, do not automatically preclude an order of return." Id. at 1345.

97.     The Convention provides for four defenses to return:

**(1)** the petition is being filed more than one year after the child's removal, and the child is well settled in the removed-to country (art. 12); **(2)** the petitioner was not actually exercising his or her custodial rights at the time of removal or consented to or subsequently acquiesced in the removal or retention (art. J 3a); **(3)** there is a grave risk of physical or psychological harm to the child if returned, or return would otherwise place the child in an intolerable situation (art. 13b); and **(4)** return would violate fundamental United States principles on human rights and freedom (art. 20).

**A.     Petitioner filed more than one year after the Child's wrongful removal and retention; the Child is Well-Settled in the New Environment**

98.     It has been 14 months since child was wrongfully removed and retained by the Respondent.  The Father on May 16, 2022 (6 Months after wrongful removal and retention) began the process with the Central Authority for the Discharge of The Hague Convention on Civil Aspects of International Child Abduction of 25 October 1980.

**26**

99.     It has only been 60 days since the father found the current location of the Child and started the process to file the Petition to Return Child in the Jurisdiction of where Child is currently located, Middle District, Orlando Division.  It is well understood that, it is an arduous process to collect the required documentation, locate the Child in another country, and begin the application process.

100.    De Carvalho v. Pereira, 308 So. 3d 1078 (Fla. 1st DCA 2020), is the most recent case that provides analysis on return of Child after one year wrongful and retention and examination of "Well- Settled."

95.     A child is settled within the meaning of the International Child Abduction Remedies Act and the Hague Convention when a preponderance of the evidence shows that the child has significant connections to their new home that indicate that the child has developed a stable, permanent, and non- transitory life in their new country to such a degree that return would be to the child's detriment. Temporary disruption of the child's life is not a sufficient detriment in this context, and the settled inquiry requires courts to carefully consider the totality of the circumstances.  **De Carvalho v. Pereira**, at 1081.

96.     Despite the LBP filing his Petition in the United States after one year, the passage of the Child is not settled to such a degree that return would be detrimental.

97.     The Child is attending a "D" rated public school and is performing satisfactorily. A satisfactory student and a "D" rated school, according to the Florida Department of Education indicates less than satisfactory performance.

98.     The Child's current education is subpar to the education he would receive in Venezuela at a private school and private tutoring classes.  The education the Child receives now will be the building blocks to the child's future for him to be a successful student, have age-appropriate

social skills, and be socially confident.

99.     The Child did not attend school until recently, so he did not have other children to socialize and play with, he lacks ties to the community, has sparse and irregular contact with the Father, family and friends in Venezuela. DeCarvalho, at 1085.

100.     As previously provided more in-depth, the disruption to the Child's life has been significant, material, and detrimental. The Child had a very full life in Venezuela and did not lack for any basic necessities. In fact, he enjoyed many luxuries that are unaffordable in the United States by even the average citizen.

101.     Juxtapose to his life in the United States which has been unstable and transitory. It is evident that crossing international borders without Visas can create a risk of emotional mental, and bodily harm in the long trek to the United States. His trek to Florida was a traumatic experience that cannot be denied, and it will take a significant amount of time to process. The Child's mental and emotional health will surely be treated quicker in Venezuela where he has the benefit of a team of medical doctors, counselors, friends, and family to assist in his healing.

102.     The Abducting Parent cannot show this Court that to return the Child to Venezuela would be detrimental. The education the Child is receiving from attending elementary public school is *subpar*. Due to the Child's trauma he, most likely, has trouble making or keeping friends, lacks ties to community, and has sparse and irregular contact with his Father, family and friends in Venezuela. In fact, it would be a detriment to the Child to remain in the United States for all the reasons set forth herein above.

103.     It has been 14 months since the Mother wrongfully removed and retained the Child. Petitioner has been working diligently and continuously, since May 16, 2022, to do everything

possible to find the Child's location and for the Child to return to Venezuela[11]. The Respondent and

Child were on a trek across the United States starting at Andrade, California to Central Florida. It was

an overwhelming assignment to locate persons somewhere in the United States that are

undocumented, traveling in private vehicles, buses, and under false names.

104.    De Carvalho, further examines "Habitual Residence". Habitual residence" is not

defined by the Hague Convention or ICARA. *Avendano v. Smith*, 806 F. Supp. 2d 1149, 1164

(D.N.M.2011). But a child's location or domicile is not the same as a child's "habitual residence" as

contemplated by the Hague Convention. Kijowska v. Haines, 463 F.3d 583, 586-87 (7th

Cir. 2006). The Supreme Court has rejected any "categorical requirements for establishing a child's

habitual residence" and disapproved of any "bright- line rule" which would result in "a presumption

of no habitual residence for infants, leaving the population most vulnerable to abduction the least

protected." Monasky, 140 S. Ct. at 728. De Carvalho v. Pereira, 308 So. 3d 1078, 1083-84 (Fla. 1st

DCA 2020).

105.    To meet the first affirmative defense, that the Child is Well Settled in his new

environment, Respondent must demonstrate by a preponderance of the evidence that the Child is now

settled in the United States. See Castellanos Monzon, 2016 U.S. Dist. LEXIS 45825, 2016 WL

1337261, at *12 ; see also  Monzon v. De La Roca, 910 F.3d 92, 100 (3d Cir. 2018) .

The court in Castellanos Monzon highlighted the following non-exhaustive factors that a

court should typically consider in determining whether the well-settled defense is applicable:

---

[11] Kijowska v. Haines, 463 F.3d at 587 (7th Cir. 2006), holding that since a parent cannot create a habitual residence by wrongful retention of the child, "[t]he length of the child's residence in the country of one of the parents cannot be decisive".

(1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the parent's employment or other means of support; (6) whether the child has friends and relatives in the area; (7) to what extent the child has maintained ties to the country of habitual residence; (8) the level of parental involvement in the child's life; (9) active measures to conceal the child's whereabouts (and the possibility of criminal prosecution related thereto); and, (10) the immigration status of the child and parent.

Bejarno v. Jimenez, Civil Action No. 19-17524, 2020 U.S. Dist. LEXIS 128123, at *22 (D.N.J. July 21, 2020); see also Lozano v. Alvarez, 697 F.3d 41, 57 (2d Cir. 2012)

106.    Despite the court's emphasis on length of stay[12], the U.S. State Department's analysis of the Hague Convention it states:

"The reason for the passage of time, which may have made it possible for the child to form ties to the new country, is also relevant to the ultimate disposition of the return petition. If the alleged wrongdoer concealed the child's whereabouts from the custodian necessitating a long search for the child and thereby delayed the commencement of a return proceeding by the applicant, it is highly questionable whether the respondent should be permitted to benefit from such conduct absent strong countervailing considerations."

51 Fed.Reg. 10494, 10509.

107.    In addition, some courts have taken the position that the immigration status is a factor

---

[12] See In re B. Del C. S. B., 559 F.3d 999, 1009 (9th Cir. 2009); see also In re Ahumada Cabrera, at 1314.

in the "settled environment" analysis, even if immediate deportation is not at hand[13].

108.    Moreover, a court may consider the active measures undertaken to conceal the child's whereabouts, as well as the prospect that the abducting parent could be prosecuted for violations of law based on the concealment. <u>Lops v. Lops</u>, 140 F.3d 927, 946 (11th Cir. 1998).

109.    Concealing a child can forestall a well-settled defense. **<u>Romero v. Bahamonde</u>**, No. 1:20-CV-104 (LAG), 2020 U.S. Dist. LEXIS 249721, at *48 (M.D. Ga. Nov. 19, 2020)

110.    An abducting parent who conceals a child's whereabouts may not profit by running out the clock on the 1-year period.

"American courts have found as a factual matter that steps taken to promote concealment can also prevent the stable attachments that make a child "settled." See, *e.g.*, *Mendez Lynch* v. *Mendez Lynch*, 220 F. Supp. 2d 1347, 1363-1364 (MD Fla. 2002)

<u>Lozano v. Alvarez</u>, 572 U.S. 1, 17, 134 S. Ct. 1224, 1236 (2014)

111.    Lastly, <u>In re Petition for Writ of Habeas Corpus for Coffield</u>, 96 Ohio App. 3d 52, "the abducting parent provide evidence that the child had developed the connections to the community which a normal child of his or her age would. (affirming trial court's decision to return child to Australia, even though the child had been in the United States for three years, where the child had been in his most recent residence for only ten months and "appellant did not show that [the child] had developed the connections to the community which a normal child of his age

---

[13] See In re Koc, 181 F.Supp.2d 136, 154 (E.D.N.Y. 2001); see also Lopez v. Alcala, 547 F.Supp.2d 1255, 1260 (M.D. Fla. 2008) (finding that the children's "residence in this country is not stable because neither [the abducting parent] nor the children have legal alien status and, as such, are subject to deportation at any time").

would, i.e., appellant did not show that [the child] had developed relationships with other individuals besides those which appellant specifically chose. Under these circumstances, appellant failed to carry his burden of proof.")."

112.     **As to the first factor, the age of the child**. M.D.M.R. was a little over four years old at the time Petitioner commenced the instant proceeding. "[C]ourts generally conclude that repatriation of an infant is less burdensome on the child than repatriating an older child, who is more likely to have memories of the United States and more ties to the country." *Castellanos Monzon, 2016 U.S. Dist. LEXIS 45825, 2016 WL 1337261, at*13* (quoting Taveras v. Morales*, 22 F. Supp. 3d 219, 236 (S.D.N.Y. 2014),* aff'd, *604 F. App'x 55 (2d Cir. 2015)).* Here, M.D.M.R. is not old enough to form memories and ties to the United States. Moreover, at the time the petition was filed, M.D.M.R. had been in the United States for over 12 months. However, the months have been spent traveling across the United States, once arriving to Central Florida, he has moved at least twice. Any memories he has since his arrival to the United States are full of unprocessed trauma. In addition to losing all ties to the only life he knows. If the Child has any ties to his current environment or community, they are tenuous at best.

113.     The Child is not of Sufficient Age and Maturity to Object to Being Returned. The Child is tender age of 5 years old. He does not have the intellectual capacity or maturity necessary to decide where he wants to reside.[14]

---

[14] A court is not bound to order the return of a child if the respondent demonstrates by a preponderance of the evidence that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of the child's views. See Article 13 of the Hague Abduction Convention. Each case is fact intensive. See Escobar v. Flores, 183 Cal. App. 4th 737 (3d App. Dist. 2010) (affirming trial court's refusal to return to Chile a 9-year old child, who was extremely communicative, not under any undue influence, and demonstrated sufficient age and maturity to take into account his objection to being returned to Chile); Lopez v. Alcala, 547 F. Supp. 2d 1255, 1259 (M.D. Fla.2008)(a 7-year-old child had not reached an age and degree of maturity; 10-year-old child had reached an age and degree of maturity, but her wishes were ambivalent); Mendez Lynch v. Mendez Lynch, 220 F. Supp. 2d 1347, 1362 (M.D. Fla.2002) (a 9-year-old child had reached an age of maturity such that his views should be considered); In re D.D., 440 F. Supp. 2d 1283, 1297 (M.D. Fla. 2006) (a 6-year-old child had not reached an age and degree of maturity to make it appropriate to take her views into account). In Florida, one time-sharing factor that courts consider is "the reasonable preference of the

114.    This factor favors the Father that the Sufficient Age and Maturity to Object to Being Returned.

115.    **As to the second actor, the stability of the Child's new residence**.  M.D.M.R. has not had stable housing for many months and has resided throughout the United States, from California to Central Florida.  Mother and her current husband cannot provide the stability of housing when their immigration status, economic situation, and employment opportunities are extremely limited.  Respondent's testimony of security and stability for the Child cannot be proven with verifiable credible evidence that demonstrate that M.D.M.R.'s move to Sanford, Florida, is a stable living situation.

116.    The minor child has illegally been in the United States with the Respondent for 14 months, certainly not enough time to become well-settled in the United States or the Central Florida area. Especially, a child that has lost the benefit of certain comforts, and such as swimming classes,  advantages of a private school with small class sizes and individual attention, medical care as well as dental health and professional counseling from a licensed counsel that specializes in Child[15] to facilitate the considerable adjustment, housing with high tech security system.  that are not available to him in the United States. In addition, the Respondent has placed the Child in a position to have to work through extreme trauma by the actions of the Respondent to relocate to the United States illegally and secretly with the assistance and in close accompaniment of nefarious individuals. Placing the Child in unhygienic situations, where he can be infected by a host of illnesses

---

child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference. "See section 61.13(3)(i), Florida Statutes (2011). Likewise, in determinations about whether to permit a parent to relocate with a child, courts applying Florida's relocation statute must evaluate among many factors, "the child's preference, taking into consideration the age and maturity of the child." See section 61.13001(7)(d), Florida Statutes (2011).

[15] A licensed professional psychologist is vastly different that a school counselor.  A school counselor is the only type of mental health that the Child currently has available to him.

and diseases.

117.    Due to the precarious legal status of the Respondent and her current husband, even if the smallest change in their finances occur, they can be evicted from their apartment. Further, it is unknown if the lease for the apartment is in their name. The Mother cannot benefit from any housing allowance or subsidy and it is reasonable to believe Respondent could not qualify for a lease in her own name.

118.    Moreover, the Child, Respondent and current husband may reside in cramped quarters with another family. Thus, the Child does not have the same privacy as he did in Venezuela and must share space with individuals he does not know or trust.

119.    This factor favors the Father that the Child is not stable at his new residence.

120.    **As to the third factor, whether the child attends school or daycare consistently**. It is unknown to the Father whether the Child was enrolled in school until the Mother sent her Response that attached a Form. Respondent has not shared any information from a school that shows his academic progress. Respondent's Response states "Even though English is not his native language, my son has managed to have the merits to excel; My son is a happy child with a unique intellectual ability, which has led to the recommendation of the teachers at his school that he enters a school program for exceptional children, who is in the admissions stages and receive classes at a grade higher than his age".

121.    The Courts have also stated that a more comfortable material existence is not dispositive of the child being settled. __Cabrera v. Lozano (In re Cabrera)__, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004), citing Lops v. Lops, 140 F.3d 927, 946 (11th Cir. 1998). In fact, *Lops* directs courts to look beyond a comfortable material existence and to consider the child's living environment, Lops, 140 F.3d at 946.

34

122.    Here, it is undeniable that the abducting Parent went to great lengths to conceal the Child's whereabouts. From the time of the wrongful removal and retention of Child and despite the dozens of requests by the Father to know the whereabouts of the Child, the Father through extraordinary means found the location of the Child, so he could commence this action in the Middle District of Florida.

123.    The Respondent description is at best a lack of understanding of the United States Public School System or is a fabrication. The Child attends a subpar public elementary school and is a satisfactory student. The Conference Form is void of any particulars concerning the Child, ESOL (English to Speakers of Other languages) classes, exceptionalism in science, mathematics, social studies, writing, reading and comprehension.

124.    Most recently the Father has come to find out that the Child is not at grade level at this public school, especially in English. Though he is very bright and a naturally strong learner, he is handicapped to achieve at the same pace when he studied in Venezuela. The Child has suffered great learning loss due to COVID restrictions and his wrongful removal and retention. However, in Venezuela there are more opportunities to secure private tutoring sessions at home for a reasonable fee, and the Father can secure a private education for the Child.

125.    The Child is receiving a subpar education at Pine Crest Elementary in the Seminole County Public School. In 2022, Pine Crest Elementary was given a "D" rating[16]. The Parent- Teacher Conference Form[16] dated 10/25/2022 (hereinafter "Conference Form" or "Form") the Respondent provided with her Response. Is not a reliable indicator of the Child's academic performance. The Form is incomplete and only for the first quarter. At best, the Child is academically at satisfactory

---

[16] Please see Seminole County School Grade Summary as **Exhibit "R"**

levels for a "D" rated school. There is no evidence that the Child has been designated as gifted. In addition, the Child most likely is not being challenged and is not performing at his peak due to language barriers, child not feeling safe, lack of confidence, and confusion how to fit in a new culture causing him culture shock. Please find Pine Crest Elementary Parent-Teacher Conference Form attached as **Exhibit "S"**.

126.    The Respondent and current Husband cannot provide the Child with the same level of education he received and will receive in Venezuela. The class sizes in the Seminole County Public Elementary Schools are far larger than the school he attended in Venezuela. The extra attention the Child requires to heal from the trauma of being torn apart from his Father, family, school and classmates, friends, language, and culture demand extra attention. Further, the school currently attended by the Child is a "D" rated school. Even though the government in Venezuela has its challenges, persons with the financial resources such as the LBP can secure private school for the Child and have the time to assist in the Child's development, especially if he is an intellectually gifted child as the mother purports.

127.    In this Venezuela, the child was able to experience the beaches and mountains with his extended family and experience extracurriculars with his schoolmates and friends. Due to his immigration status, the Child can no longer enjoy the extracurricular activities other children his age can experience such as, sports, swimming classes, field trips at school, and weekend excursions throughout Florida and the United States. The Mother has surely sequestered the Child due to her lack of financial resources, opportunities, and efforts to conceal the Child from the Father.

128.    This factor favors the Father that the Child has not attended school or daycare regularly since the Respondent's wrongful removal and retention.

129.    **As to the 4th factor, whether the child attends church regularly**. In Venezuela, the Child regularly attended Church with his Father and grandparents. The Father was teaching the Child the precepts of Catholicism in preparation to begin his religious education in Catholicism and catechism. It would be reasonable to believe that while the Respondent and her current husband were on the run, the Child did not attend Church or had fellowship with fellow Catholics. The Father and Respondent have a shared understanding that the Child would be raised in the Catholic Church, celebrate the Holy days, and fellowship with others of the Catholic faith.

130.    This factor favors the Father that the Child has not attended church regularly and has not been enrolled in formal Catholicism classes as was the intent of the Father and Mother in Venezuela.

131.    **As to the fifth factor, the stability of the respondent and her current husband's employment of other means of support**. It is believed that Respondent is an asylum seeker and may not have a work permit. However, even if she does have a work permit, it is unclear if she is employed or has a source of income. Nevertheless, her status as an asylee does not guarantee that a work permit will be issued, withdrawn or deported. Nothing in Respondent's life is free of tremendous insecurity, anxiety, or difficulty that is easily overcome. The Mother has conversational English-speaking skills, but she is not fluent in reading and writing. Without the basic reading and writing skills, her employment possibilities are very limited. Most importantly without strong English skills to help the Child with school, or financial means for a tutor, the Child may indefinitely be at a disadvantage academically. Regrettably, a person that does not have command of the language or at a deep disadvantage and are more prone to being taken advantage of economically, and otherwise.

132.    Additionally, the uncertain immigration status of a parent and her child is a factor

suggesting that a child is not settled. In re Koc, 181 F. Supp. 2d at 154.  Cabrera v. Lozano (In re Cabrera), 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004)  Respondent and Child do not have the security of a permanent home. Respondent wages are minimal and not sufficient to afford housing on her own. Respondent's current husband is unreliable as well, as his immigration status is as an Asylum seeker. Though it might be insensitive, the facts are  that the current husband can abandon the Respondent and the Child at any time, and he has no legal obligations to the Child and has no duty to support the Respondent as his wife.

133.    The additional stress of instability further demonstrates that the Child is not settled, and his situation can quickly change, depending on the Mother's economic circumstances and spousal relationship.  Any reliance the Mother may feel with her current husband are not guaranteed. Respondent is unable to provide safety and security for herself or to the Child, due to the Respondent's uncertain immigration status.

134.    To the best of Petitioner's knowledge, both Respondent and her current husband are working as laborers.  In Venezuela, they both enjoyed employment that provided a certain amount of security that flowed to the Child.  In comparison, in the United States the day to day needs of the Child are peppered with insecurity.  Respondent and her current husband cannot provide the stability of employment, secure and safe housing for the Child, Child's sustenance, or medical care.

135.    The Child is not eligible for any government support due to the Respondent's reckless and wanton trek to the United States.

136.    This factor favors the Father the Respondent and her current husband's employment is not stable and any other means of support are tenuous.

137.    **With respect to the six factor, child does not have friends and relatives in the area**.  To the best of the LBP knows,  the Respondent does not have any family in the surrounding

area of Sanford or Florida. Not enough time has passed for the Child to establish healthy and age-appropriate friendships. Even at the tender age of 5, a good friend is described as a child that is kind, supportive, trustworthy, and a good listener. A friend can be described as someone the Child not only shares toys, but also shares ideas. This Child has a lot of trauma to process. It is reasonable to believe that he may not know how to process his strong emotions and stressful experiences survived during the last year. This may cause the child to turn into himself, naturally other children will be curious about the Child's past life. It is very probable that because he has not processed his own trauma, he is unable to answer the questions the other children have about his past or share his stories with others. Further the Child may lose his confidence and struggle in social settings because he lacks the stability and security at home.

138.    In Venezuela the child had a large support system of loving family and friends to assist with any needs of the child. Here, is Seminole County the respondent must rely on people she barely knows or strangers to assist her with the child's basic needs.

139.    This factor favors the father that the Child does have any true friends that like each other's company, feels comfortable, can share toys, as well as feelings, care about and play with. Further, the Child no longer has have the love and attention of his Father or large extended family and cousins that are his same age.

140.    **As to the 7th factor, to what extent the child has maintained ties to the country of habitual residence.** M.D.M.R. was removed from Venezuela when he was four years old. At the time having been in school for about two years, M.D.M.R. had many friends in Venezuela. He was involved in extra-curricular activities while in Venezuela, he would go to the many places of interest in the surrounding area, including the beaches and mountains, he would have play dates with his friends.

141.    Since moving to the United States, he has had at best sporadic communication with the LBP who still lives in Venezuela. The Mother has severed the Child from the only culture, language, and community he knows. The Child has no contact with his doting paternal grandparents, uncles, aunts, and cousins. In Venezuela, his family is very close knit, and his cousins were his best friends. Further, Respondent also has a large family that remains in Venezuela and those ties may also be broken. The Child should have contact with both sides of his family, but the Mother has severed the Child from the Father and his extended paternal family.

142.    This factor favors the Father that the Child has not been able to maintain ties to Venezuela, the country of habitual residence. Child has been stripped of his Father , family, friends, language, and culture suddenly and without being able to say good bye to the people he loves most.

143.    **With respect to the 8th factor, the level of parental involvement in the child's life.**[17]

144.    Mother married her current Husband on August 20, 2021, and 2 months later she wrongfully removed and retained the Child. The LBP has not witnessed extended interactions between the Child and current husband. The Child is very amiable, shy, and a pleaser. So, if there

---

[17]Bejarno v. Jimenez, Civil Action No. 19-17524, 2020 U.S. Dist. LEXIS 128123, at *27-28 (D.N.J. July 21, 2020) Both Respondent and L.S.'s stepfather appear to have a close relationship with L.S. Respondent credibly testified that L.S.'s stepfather, with whom L.S. has grown close, enjoys spending time and playing with L.S. Evid. Tr. Vol. 2 at 150:1-9. Respondent also testified that their family enjoys going to the park and beach. Id. at 148:10-13. Additionally, Respondent obtained a pediatrician for L.S. when they first arrived in the United States and made sure that L.S. received all of his immunizations. Id. at 143:19-22. See Castellanos Monzon, 2016 U.S. Dist. LEXIS 45825, 2016 WL 1337261, at *14 (finding eighth factor in favor of settlement where respondent and new partner enjoyed close relationship with child, and where respondent obtained regular pediatrician for child in United States); see also Ramirez v. Buyauskas, No. 11-6411, 2012 U.S. Dist. LEXIS 24899, 2012 WL 606746, at *18 (E.D. Pa. Feb. 24, 2012), amended, 2012 WL 699458 (E.D. Pa. Mar. 2, 2012) (finding eighth factor in favor of settlement where "[r]espondent enjoy[ed] a very close relationship with her children, for whom she is the primary caretaker," and that "[t]he success with which [respondent's] children adapted to the United States reflects well on respondent's ability to parent her children, including . . . getting her children vaccinated once they arrived in this country."). Accordingly, the Court finds that the eighth factor weighs in favor of finding that L.S. is settled.
Bejarno v. Jimenez, Civil Action No. 19-17524, 2020 U.S. Dist. LEXIS 128123, at *27-28 (D.N.J. July 21, 2020)

was any close connection before the Respondent wrongfully removed and retained the Child it is unknown to the Petitioner. However, the Petitioner does not recall the Child making any positive or negative comments about the current husband.

143.    The Respondent nor Respondent current Husband consulted with the Father as to what school the Child would be enrolled. Respondent nor Respondent current Husband have not provided any information concerning the Child's health to the Father. It is apparent that the Child is overweight. This could be caused by poor diet, depression, or disease. Furthermore, Respondent and Respondent current Husband have kept the Father in the dark concerning the Child's mental health as well.

144.    The Respondent and current Husband have not placed the Child's interest before their own. It is undeniable every decision they have made has been to further their objects and "hope" the Child can cope.

145.    Respondent and current Husband have decided that Child will be enroll and attend a subpar elementary school, not provide the Child with health or dental insurance, Child has not been had the benefit of a professional that specializes with Child trauma. A staff counselor at the school is insufficient (if they have a counselor), to provide the special tools and support he needs.

146.    In the United States, the Child, Respondent nor current Husband are eligible to receive any medical benefits for the Child. The Child has no medical insurance and does not qualify for Medicaid in Florida. In Florida, upon being granted asylum, you are eligible for only eight months of Medicaid or Refugee Medical Assistance (RMA). Medicaid and RMA are free insurance programs designed to assist you with any medical problems you may have. In Venezuela, the Child can receive government medical benefits. In addition, father continues to pay for medical insurance for the Child and has the added advantage of having a father in the medical field with colleagues that are

willing to provide any extra care needed or required.

147.    The few photographs that the father has received of the Child, shows a child that is overweight for his age. Most likely due to a poor diet or even anxiety and depression. Please see **Exhibit "Z".**

148.    Moreover, the current husband's income is not sufficient to allow the Mother to stay home and be the primary caregiver for the Child. The Mother must rely on new acquiesces with unknown backgrounds that she does not have the same confidence and security than the family she relied on in Venezuela.

149.    In Venezuela, it was the Father that assisted the Respondent in all areas of shared parental responsibility. In some family's the new husband might assist in drop offs or pick-ups, the current husband did not involve himself in the day-to-day needs. If the Mother needed assistance, she would call the Father, her mother, or other extended family. Due to the Mother's economic situation, she cannot devote the same amount or quality of time to the Child. Both Respondent and current husband must make big sacrifices to meet the challenges they have as illegal immigrants.

150.    This factor favors the father, the Respondent and current husband the level of parental involvement has been minimal. The Respondent and new husband might have a close relationship, despite the normal challenges of a newlywed couple, in addition to the substantial stresses of relocating to a new country with different culture, norms, language, and infrastructure. However, it is crystal-clear that as a couple they have not made an effort to provide the basic needs for the Child's housing, education, or education in the United States.

151.    **As to the ninth factor, active measures to conceal the Child's whereabouts (and the possibility of criminal prosecution related thereto).** It is undisputable that the Respondent

concealed from the Father the removal of M.D.M.R. from Venezuela the Child's whereabouts until they were both in the United States.

152.    Name on Pine Crest Parent Teacher Form is Mathias Medina Ramirez.  Mathias Medina Ramirez is not the Child's name.  On all of the Child's official forms of identification including his birth certificate is M.D.M.R. The Conference form provided by Mother , conveniently does not have the listed address for the Child.  Please see **Exhibit "S."**

153.    Even though it is suspected that the Respondent is working as a laborer (independent contractor), it is extremely possible that she continues her enterprise she established in Venezuela and is generating income without the need to expose herself or Child to be discovered.  It is unknown if the Respondent has been able to secure housing under her name, which would further help her conceal the Child's whereabouts.

154.    Respondent has cut off all communications with the Father and refuses to allow the Child to talk to the Child via cell phone or video call.

155.    Respondent has not allowed any contact between the Child and his beloved grandparents, aunts, uncles, and cousins and has blocked them from her social media.

156.    Respondent has blocked the Father from all her social media accounts.

157.    Due to the Respondent's concealment of the Child, the Petitioner has had to secure extraordinary measures to gain the information necessary to locate the Respondent and Child. The few times the Father could communicate with the Mother he plead for the Child to return to Venezuela. The Respondent has cut off all communication with the Father via social media, cell phone, WhatsApp, and any other electronic means of communication for long periods of time not allowing regular and effective communication.

158.    Since the Respondent and current husband entered the United States without the proper permission, and without valid a U.S. VISA, it is uncertain if they will be charged for violation of the United States Federal Immigration Laws. In addition, it is unknown if there are active warrants for the Respondent and her current husband for possible crimes in the long trek from Venezuela to Mexico then into the United States and ultimately to Central Florida.

159.    This factor favors the father.  The Respondent and current husband have made each and every decision to further their goal of illegally entering the United States with a child, to gain favor with the United States Department of Immigration and Naturalization, free services with local government, charities, and other non-profits that assisted "families with minor Children."  The intentional measures undertaken to elude the Father of the Child's whereabouts was also an attempt to manipulate the laws of the United States concerning automatic return of child before one year of wrongful removal and retention.  For the Court to find this factor in favor of mother is to approve concealment of a Child that is wrongfully removed and retained without the LBP consent.

160.    **As to the tenth factor, the immigration status of the child and parent**. Respondent and Child are not citizens of the United States, even though the Respondent may have sought asylum in the United States, their immigration status remains uncertain.

161.    Respondent's immigration status remains  uncertain.  Child's  immigration status is derivative of her mother's status, which is troubling,  until he turns twenty-one or obtains some form of independent immigration status.

162.    The Courts have decidedly in favor of returning a Child to his habitual place of residence when immigration status is uncertain.

"In re Cabrera, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004) (reasoning that it would

be better to send a child whose immigration status is uncertain back to her State of habitual residence sooner rather than later, because the effect on the child would be much more negative if she were allowed to remain in the United States until she became "firmly settled" and then were deported); In re Koc, 181 F. Supp. 2d 136, 154 (E.D. N.Y. 2001) (noting that "[t]he fact that the Immigration Service may not be looking to deport them at this time does not, in any way, guarantee that that position will not change in the future or that [the child] and her mother will ultimately become legal permanent residents of this country" when concluding that the child was not "well-settled" in the United States). The illegal immigration status of the parent with whom the child lives in the United States might also negatively affect the ability of the non-custodial parent to visit the child. See id."

Casimiro v. Chavez, No. 1:06-CV-1889-ODE, 2006 U.S. Dist. LEXIS 76620, at *16 (N.D. Ga. Oct. 13, 2006)

163.    The longer Child remains in the United States, the further removed he becomes from his friends and family in Venezuela, and the harder it will be for him to readjust to life in Venezuela following deportation from the United States.

164.    The Respondent has placed her interest before the interest of the child in a multitude of ways. Most importantly and foremost, is that it is undisputable that the Child's immigration status is equally precarious and fraught with uncertainty. Even though he is currently very young, 5 years old, the Respondent has placed the child in a situation where he will be forced to live in the shadows of society without any safeguards that are afforded to citizens of the United States. Further, because the Respondent entered the United States without the proper permissions, with the Child, as it is the

law now, they would have to return to Venezuela to gain lawful entry to the United States. On the other hand, if the Respondent has requested Asylum for herself and the Child, any allegations of political or criminal threat are unfounded. It is also tentative that if any temporary legal status has been granted, it may be withdrawn at *any time* and may subject the Child to more undue trauma due to deportation.

165.    Respondent wrongfully retained and removed the Child from his habitual place of residence. The inception of removing and retaining the Child wrongfully has placed the child at grave risk, unable to assimilate under the constant stress and unease of an abrupt relocation without an opportunity to process the trauma of illegally crossing the border.

166.    The Child is not well settled in the United States, State of Florida, or Seminole County.

**2.    Petitioner Was Exercising His Custody Rights At The Of The Child's Removal.**

167.    At the time of Respondent's wrongful removal and retention of the Child, and currently, Father and Respondent exercised and possessed equal custody rights under Venezuela law. Article 3 of the Convention provides that the law of Venezuela determines the issue or custody in this case. See also Hanley. 485 F.3d at 645 ("existence of 'rights of custody' are determined by the law of the country in which the child habitually resides at the time of removal.").[18]

168.    Petitioner unequivocally had custody rights pursuant to the Custody Order entered by the appropriate Courts of Venezuela and the Decree of Venezuela. Petitioner never relinquished or waived these rights, and the Custody Order and the Breach of Custody Order have

---

[18] Pursuant to Article 14 of the Convention; this Court "may take notice directly of the law of... the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Sec also, Fed. R. Civ. P. 44.1.

never been modified or reversed. Respondent kidnapped the Child... Respondent's continuing retention of the Child in the United States against Petitioner's expressed desire for his return to exercise his custody rights is an ongoing violation of the Father's custody rights under the laws of Venezuela.

169.    Father was exercising his custody rights when the Respondent removed the Child from Venezuela. In addition to his rights under the Decree of Venezuela and the Custody Order, Father, among other things, provided for his shelter, food, clothing, companionship, education, and health care from the time of his birth to the time of Child's wrongful removal from Venezuela. "The exercise of custody rights includes a parent's providing financial support and attempting to keep, or to seek, regular contact with a child." Angulo Garcia v. Fernandez Angarita, 440 F. Supp. 2d 1364, at 1379 (S.D. Fla. 2006), citing Cabrera v. Lozano (In re Cabrera), 323 F. Supp. 2d 1303 at 1311-12 (S.D. Fla. 2004)) ("no question that Petitioner was actually exercising his custody right... [when he] saw and spoke to the children frequently ... arranged for their schooling ..."). The attached Custody Order, birth records, school records, health insurance and swimming classes establishes that Father was exercising his custodial rights prior to the Respondent's wrongful removal of the Child from Venezuela. Please find  attached **Exhibit's "F", "J", D" , "M," and "T."**

170.    Respondent and Father were equal caregiver's and Father provided financial support to the Child. Petitioner saw the Child every day, birthdays, holidays, and weekend trips. Both parents shared in the responsibility and caring for the Child on a day-to-day basis. Moreover, a parent can be found to have failed to exercise custody rights only by acts that constitute "clear and unequivocal abandonment of the child." Bocguet, 225 F. Supp. 2d at I 346.   Father's conduct supports the completely opposite conclusion.

171.    Accordingly, Father has clearly established a prima facie case of wrongful removal and retention under the Convention.

172.    Respondent's retention of the Child is wrongful within the meaning of Article 3 of the Convention because:

(a)    **It is in violation of Petitioner's rights of custody as established by Venezuela law.** Specifically, Respondent's retention of the Child is in violation of Petitioner's right to joint custody under the article 76 of the Constitution of the Bolivarian Republic of Venezuela, likewise article No. 3 of the Convention on the Rights of the Child establishes in pertinent part the following "In all measures concerning children taken by public or private institutions welfare authorities, courts, administrative authorities or legislative bodies, a primary consideration to be given shall be the best interests of the child".   On the other hand, the Organic Law for the Protection of Children and Adolescents establishes the following articles: **Art. 347** (Definition of Parental Authority); **art. 348** (Content of Parental Authority);

**art.349** (ownership and exercise of parental authority); art.358 (Content of parenting responsibility); **art.359** (Exercise of parenting responsibility) and art.360 (Measures on parenting responsibility).

A copy of the codes referenced herein are attached as **Exhibit "E".**

(b)    **At the time of the Child's removal from Venezuela, Petitioner was exercising his rights of custody within the meaning of Articles 3 and 5 of the Convention and, but for Respondent's removal and retention of the Child, Petitioner would have continued to exercise those rights;**

173.    Father was exercising time sharing as court ordered and paying his child support.

Father had significant and material contact with the Child and was involved in his day to day life. The Father shared his parental responsibilities with the Mother.  As previously discussed the Father would assist the Mother whenever she needed additional child care.  Father paid for the Child to have health insurance and private school, as well as swimming classes.

(c)    **The Child was habitually resident with Petitioner in Venezuela within the meaning of Article 3 of the Convention immediately before his removal and retention by Respondent.**

174.    The Child is now five years old. The Hague Convention applies to children under sixteen (16) years of age and thus applies to the Child.

175.    Venezuela was the habitual residence of the Child immediately before his wrongful removal. The Child was born and lived in Venezuela until his wrongful removal by the Mother in November 2021. A determination of a child's habitual residence for purposes of the Convention "must focus on the child and ... the parents' present, shared intentions regarding their child's presence there . . . Where there is no shared or settled parental intent, a prior habitual residence should not be considered to be abandoned unless the objective facts point unequivocally to such a conclusion. Bocquet v. Ouzid, 225 F. Supp. 2d at 1343-1344 (internal quotation marks and citations omitted). See also Ahumada Cabrera, 323 F. Supp. 2d at 1311 (" [b]ecause the Convention tries to prevent one parent from unilaterally determining the country in which the child will live, the habitual residence of the child cannot be shifted without mutual agreement").

176.    The Respondent, Child and Father resided together from, on or about, February 2017 to April 2018 at Urbanizacion Sabana Larga, residencias Puerto Madero, piso 3, apto 3D, Prebo, Valencia, Estado Carabobo [Sabana Larga Urbanization, Puerto Madero residences, 3rd floor, apartment 3D, Prebo, Valencia, Carabobo State]. Hereinafter referred to as " Sabana Larga

Residence". The Child was born February 2017, while the Father and Mother resided together and continued to reside together as a family till April 2018.

177.    Factors courts have looked to in determining habitual residence include the place a child was born and raised, attended school, and has a majority of his family. See, Bocquet, 225 F. Supp. 2d at 1311. In addition to the Divorce Decree and Child Custody Order, the attached **Exhibits "C" and "F",** birth certificate **(Exhibit "D")** and pre-school registration of the Child **(Exhibit "N")**, substantially demonstrate that Venezuela was the habitual residence of the Child before his wrongful removal. These documents show that the Child was born in Venezuela and was attending school and receiving extracurricular classes appropriate for his age, such as, swimming classes in Venezuela. Additionally, there is no evidence of Father's consent to allow the removal and retention in the United States. In fact, the evidence demonstrates that LBP denied consent for the Child to be permanently removed from Venezuela temporarily or permanently and to be subject to handicaps of having a status of illegal alien. Mother cannot produce not one scintilla of evidence that purports otherwise. The documents the Father has produced demonstrate the Child's enrollment and attendance in school and extracurricular activities show that Venezuela was the habitual residence of the Child, Petitioner, and Respondent. There is no evidence of any intent to change the habitual residence of the Child.

178.    The Child, Respondent, and current Husband resided at the Sabana Larga Residence. In Venezuela the Mother was a successful entrepreneur that had established her own enterprise. Her enterprise was a success and lucrative, by selling high end products to the weathiest people in Venezuela it gained her access to people with connections in the government.    The Mother current Husband worked for city hall as an accountant. He left that employment for another prestigious

position as a warehouse manager. Their combined income allowed them to live a lifestyle that was comfortable. In addition, the Mother and Child resided in a home that was purchased by the maternal grandmother and gifted to the Respondent. The Respondent did not have any financial responsibilities for the home, other than regular upkeep. Therefore, the Respondent and Child had the advantage of living in a home without having to pay rent or a mortgage, two ample incomes, and the Father's child support. The Respondent and Child were not in danger of being displaced. In conclusion, their economic situation was very comfortable for Venezuelan standards, and they enjoyed many comforts that are not affordable in the United States, for example, a maid, nanny, and driver (as needed).

179. The Child continues to be a citizen of the Republic of Venezuela. The Child has never resided outside the Republic of Venezuela. The Child had never traveled outside the Republic of Venezuela.

180. The Child, Petitioner, Respondent, and Respondent's current Husband had established a day to day stable and secure regimen for the Child to include shared parental responsibilities, home of child, time sharing schedule, education, extracurriculars, enjoyment of close extended family ties, financial support, health insurance, as well, as emotional support. See, Bocguet, 225 F. Supp. 2d at 1344 (France was the habitual residence of a child where he had spent the vast majority of his life there, had attended pre-school there, and there was no settled parental intent to leave France because one parent had a three-year apartment lease and the other had applied for a temporary residency permit). Moreover, most of the relatives of the Child, including her maternal grandmother, paternal grandmother and a number of aunts, uncles, and cousins live in Venezuela. In contrast, the Child and Mother have a very limited support system in the United States. The only support the Child has, is his stepfather, who has no legal obligation to the Child

and can provide no real economic support due to his own tenuous legal status in the United States.

181.    Accordingly, Petitioner has clearly established a prima facie case of wrongful removal and retention under the Convention.

**C.    There is NOT a Grave Risk of Physical or Psychological Harm[19] if the Child is Returned**

182.    There is no evidence, other than Respondent's Statement, that the Child experienced any physical or psychological harm, or otherwise while he resided in Venezuela. In the contrary, he was surrounded by family, friends, had a sense of security, stability, and safety. He enjoined his routine of school and swimming classes. The Father would take the child on day trips to the ocean or mountains, national parks, and other recreational activities.

183.    This Court has examined similar facts in Grijalva v. Escayola, No. 2:06-cv- 569-FtM- 29DNF, 2006 U.S. Dist. LEXIS 93532 (M.D. Fla. Dec. 28, 2006). That case involved a Petition to Return Child to Mexico. The grave risk exception requires evaluation of the risk of physical harm to the child, psychological harm to the child, or if return would otherwise place the child in an "intolerable situation". Like the other exceptions, this is a narrow exception. England, 234 F.3d at 270-71; Whallon v. Lynn, 230 F.3d 450, 459 (1st cir. 2000); Nunez-Escuder v.Tice-Menley, 58 F.3d 374, 376 (8thCir.1995). Grijalva v. Escayola, No. 2:06-cv-569-FtM-29DNF, 2006 U.S. Dist. LEXIS 93532, at *15 (M.D. Fla. Dec. 28, 2006).

---

[19] [G]rave risk of harm exception indeed is applicable to situations where the Court would be ordering the return of a child to a zone of war, famine or disease. *See Friedrich*, 78 F.3d at 1069.
Tomynets v. Koulik, No. 8:16-cv-3025-T-27AAS, 2017 U.S. Dist. LEXIS 94742, at *55 (M.D. Fla. May 26, 2017)

184.    Similarly, to **Grijalva,** the present matter before this Court, there is not any evidence that supports a "grave risk" to the Child's return that would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," Hague Convention art. 13b; 42 U.S.C. § 11603(e)(2)(A).

185.    It is not part of the Court's inquiry whether the Republic of Venezuela government is under scrutiny by its own people. Here, it cannot be proven that if Child is returned to Venezuela he will enter a "war zone," suffer from famine, or disease.

186.    The focus of the Court is not to determine on speculation if the Child will have a better life in the United States than Venezuela or whether the father will suffer if Child is not returned. Nunez- Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995). The reason the Court considers the issue is because it limits the Court's discretion so that the Court is not used as a tool by the Court in the abducted-to country to speculate on where the child would be happiest." Fredrich, 78 F. 3d at 1068. "A removing parent must not be allowed to abduct a child and then-when brought to court-complain that the child has grown used to the surroundings to which they were abducted." Id. 1068.

187.    The "intolerable situation" requires a clear understanding of the realities of the people and circumstances awaiting the child in the country of their habitual residence. The Court may consider the environment in which the child will reside upon returning to Venezuela. Nunez-Escudero, 58 F.3d at 377. This is more than conjecture, speculation, or personal beliefs.

"The United States Department of State has stated that an "intolerable situation" under Article 13b was not intended to encompass situations such as return to a home where money is in short supply, or where educational or other opportunities are more limited than in the new country. It gave as an example of "intolerable situation" where the

53

custodial parent sexually abuses a child. Hague Convention, 51 Fed. Reg. 10494-01,

10510 (March 26, 1986).  In other words, at one end of the spectrum are those situations

where repatriation might cause inconvenience or hardship, eliminate certain educational

or economic opportunities, or not comport with the child's preferences; at the other end

of the spectrum are those situations in which the child faces a real risk of being hurt,

physically or psychologically, as a result of repatriation. The former does not

constitute a grave risk of harm under Article 13(b); the latter do."

Blondin v. Dubois, 238 F.3d 153 at 162 (2d Cir. 2001). Grijalva v. Escayola, No. 2:06-cv-569-FtM-

29DNF, 2006 U.S. Dist. LEXIS 93532, at *17-18 (M.D. Fla. Dec. 28, 2006).

188.    Respondent contends that the political environment in Venezuela is unsuitable for herself

and the Child.

189.    In Gutierrez v. Hernandez, No. 21-cv-21879, 2021 U.S. Dist. LEXIS 226811 (S.D. Fla.

Nov. 23, 2021), the Court found the Respondent did not meet her burden of grave risk of harm to the Child

by political operatives, cartels, gangs, or members of organized crime. The Respondent has no verifiable

proof that she or the Child suffered any threats, acts of violence, kidnapping, or forced to pay bribes for

her and the Child's safety. Additionally, there are no police reports, she did not tell the Father or others

of any threats made against the Child or herself.

190.    The Respondent cannot demonstrate that grave risk of harm to a Child if he returns to

Venezuela due to threats made against the Child.  Gutierrez, at 13-14.[20]

---

[20] citing Baran v. Beaty. 526 F.3d 1340, 1346 (11th Cir. 2008) (finding indirect threat to child demonstrated a grave risk
to child where a person had threatened to harm the child before and after his birth, abused the mother while pregnant,
verbally abused the mother while holding the child, and handled the newborn child irresponsibly while drunk), and Gomez
v. Fuenmayor, 812 F.3d 1005, 1012 (11th Cir. 2016) (finding grave risk of harm to child where child's mother and husband
"engaged in a campaign of terror against" child's father and his family, including threatening his life, shooting the father's
girlfriend, and vandalizing the father's mother's car, among other things), with Salguero v. Argueta, 256 F. Supp. 3d 630,
640 (E.D.N.C. 2017) (finding respondent failed to show by clear and convincing evidence that the child would face a

191.    Lastly, it is believed that the Respondent may have requested Asylum. It is prudent for the Court to also consider the necessary prerequisite to establish an exception to removal under the defense of asylum. "To establish eligibility for withholding of removal under the Immigration and Nationality Act, an applicant bears the burden of proving that it is "more likely than not" that she will be persecuted upon returning to her home country on account of a protected ground." 8 C.F.R. § 208.16(b)(2). Riera-Leonardez v. United States AG, 386 F. App'x 863, 863 (11th Cir. 2010). In addition, the Court must make a finding that it is more likely than not that Respondent will be tortured if returned to Venezuela. C.F.R. § 208.16(c)(2) Riera-Leonardez v. United States AG, at 868.

192.    Respondent's personal discontentment of the Venezuelan government is not sufficient to show that the Child is at grave risk.

193.    Respondent cannot meet her burden by clear and convincing evidence that a grave risk of harm to the Child exists.

194.    Respondent's extended family also reside in Venezuela.  Respondent did not experience any threats from the government and lived a peaceful, secure, and normal life with the Child in Venezuela. They were free to move about the country, travel outside of Venezuela, and have a tranquil day-to-day life free of threats of person or property[21].

195. The mother opened one case with the Competent Authorities in the Matters of Boys, Girls, and Adolescents (hereafter " Competent Authorities"), which is equivalent to the Department of Children and families in Florida.  The Mother alleged the Father caused great physical injury to the

---

grave risk of harm where MS- 13 made numerous threats to respondent and stepfather, including a threat to the child).

[21] The Court must find a " clear and convincing evidence of sexual abuse by a petitioner can place a child in an "intolerable situation and support a grave risk exception to return." Charalambous v. Charalambous, No.2:IO-cv-375, 2010 U.S. Dist. LEXIS 109101, at *29 (D. Mc. Oct. 12, 2010)  Friedrich v. Friedrich, 78 F.3d 1060 (6th Cir. 1996), grave risk exception applies only (1) when returning the child meant sending her to a zone of war, famine or disease, or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence for whatever reasons may be incapable or unwilling to give the child adequate protection.

Child.  The facts are the Father took the Child to the playground to play with the Child.  Through no fault of the Father, the Child skinned his knee while playing.  The father treated the knee and continued their activities at the park.    The Competent Authorities found the allegations not credible and did not remove the Child from Father's custody.  This complaint by the Mother on February 9, 2019, was one of her last attempts to remove the Father's parental rights before  wrongfully removing and retaining the Child.

196. The Child enjoyed the accompaniment of Petitioner and his extended family to help with childcare and the home had an effective security system.

197.    Prior to the Respondent's unlawful removal of the Child from Venezuela, the Child was enrolled and participated in a private school, "Centro de Educacion Inicial Casupo". The cost for the private school for 2019-2021 school years was paid by the Petitioner solely. The Father also paid the costs for school uniforms, school supplies, and extracurriculars. A copy of the registration including payments and a translation thereof are attached as **Exhibit "M".**

198.    Petitioner was solely financially responsible for the swimming classes for the Child, as well. A copy of the registration including payments and a translation thereof are attached as **Exhibit "N".**

199.    Prior to September 13, 2021, Petitioner exercised his parental rights and maintained an extremely close Father-Child relationship with the Child. Indeed, Petitioner exercised equal time sharing to include overnights, as well as, paid child support, 100% Child's school expenses, clothing, and other support.

200.    The attached Custody Order, birth records, and school records established that Petitioner was exercising his custodial rights prior to the Respondent's removal of the Child from Venezuela. Petitioner was the primary caregiver and provided financial support pursuant to the

Custody Order. Respondent also saw the Child every day, including overnights, vacations and holidays. Father and Respondent shared equally the responsibility for caring for the Child on a day-to-day basis. Moreover, a parent can be found to *have failed* to exercise custody rights only by acts that constitute "clear and unequivocal abandonment of the child." Bocguet. 225 F. Supp. 2d at I 346. Petitioner's conduct supports the completely opposite conclusion.

**D. The return of the Child to Venezuela would NOT violate fundamental United States principles on human rights and freedom.**

184.    This factor is not applicable.  Even though the Respondent has made very serious allegations against the government of Venezuela in her Statement and Response, even if we are to accept her statements as true, they do not rise to the Mother or Child being the target of a violations of Human rights as described by the U.S. Department of State, Country Reports on Human Rights Practices: Venezuela.[22]

185.    To read her Response and Statement together points a picture that it is maternal grandmother than might be the target and only when the abducting parent was in her mother's home was she subject to attacks or threats by the government of Venezuela.  There is not any allegations

---

[22] Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings by regime forces; forced disappearances by the regime; torture and cruel, inhuman, and degrading treatment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention by security forces; political prisoners or detainees; serious problems with independence of the judiciary; unlawful interference with privacy; punishment of family members for offenses allegedly committed by an individual; serious restrictions on free expression and media, including violence or threats of violence against journalists, unjustified arrests or prosecutions of journalists, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government corruption; serious restrictions on or harassment of domestic and international human rights organizations; lack of investigation and accountability for gender-based violence; significant barriers to accessing reproductive health; trafficking in persons; crimes involving violence or threats of violence targeting indigenous persons and lesbian, gay, bisexual, transgender, queer, or intersex persons; and the worst forms of child labor.

that the Child was a target or used to force or coerce the Mother.

## PROVISIONAL REMEDIES PURSUANT TO 42 U.S.C. § 11604 &HAGUE CONVENTION, ARTICLE 16

186.    Petitioner believes that Respondent, upon being informed of these proceedings, will further abscond, abduct, hide and covertly remove the Child. The Mother and Child entered the country illegally in the under the cover of night. It is very reasonable to believe that after 14 months in the United States that she has found persons that will assist her to disappear into the United States. The Mother's actions demonstrate her readiness and willingness to place herself and Child in dangerous situations to hide from the Petitioner.

187.    Clearly, the Respondent can divest the Court of jurisdiction merely by leaving the Middle District with the Child, which will obviously cost Petitioner additional time and significant expenses to file this case again, if is he able to locate the Child once again.

188.    Petitioner has traveled to the United States with a valid U.S. VISA and Venezuelan Passport with minor child's paternal grandmother.

189.    It is in the best interest of the Child, and to guarantee that Child is not removed from the jurisdiction of the Court, that the Child be placed in the custody of the Petitioner/Father that shall reside during the pendency of this litigation with his uncle Juan Carlos Eman Naranjo and his wife and two children at 737 NW 243rd Terrace, Newberry, FL 32669.   The Child will remain in the custody of the Father in the Court's jurisdiction during the pendency of this matter and shall file with the Court his Venezuelan passport.  The Father and Child shall be accompanied by paternal grandmother, as well of Mr. Eman's family that includes his children that are similar age as the Child.

190.    The Child will require an authorization by this Court so that the Child can travel to Venezuela in the accompaniment of Father and paternal grandmother, Ollyvice Andreina Lugo de

Medina. Both have valid Venezuela passports and VISAs to enter the United States.

191.    Thus, Petitioner respectfully requests this Court issue an emergent order restraining Respondent from removing the Child from the jurisdiction of this court, taking into safe keeping all of the Child's travel documents along with those of Respondent, and setting an expedited hearing on the merits of this Petition.

## FEES AND COSTS PURSUANT TO 42 U.S.C. §11607

192.    Petitioner has incurred and will continue to incur fees and costs as a result of the wrongful retention of the Child by Respondent.

193.    Petitioner respectfully requests that this Court award him all costs and fees, including transportation and travel accommodation costs, incurred as required by 42 U.S.C. § 11607 and Article 26 of the Convention.

## NOTICE OF HEARING

194.    Pursuant to 42 U.S.C. §11603(c), Respondent shall be given notice of these proceedings in accordance with the laws governing notice 111 interstate child custody proceedings, Fla. Stat. §61.518 (UCCJEA).

## RELIEF REQUESTED

**WHEREFORE**, Petitioner DANHOE ALEJANDRO MEDINA LUGO prays for the following relief:

(a)    An immediate temporary restraining order prohibiting the removal of the Child from the jurisdiction of this Court and taking into safekeeping the Child's and Respondent's travel documents, pending a hearing on the merits of this Verified Complaint, and further providing that no

person acting in concert or participating with Respondent shall take any action to remove the Child from the jurisdiction of this Court pending a determination on the merits of the Verified Complaint;

    (b)      An expedited hearing on the merits of the Verified Complaint; an order that Respondent show cause at this hearing why the Child should not be returned to Venezuela, and why such other relief requested in the verified Complaint should not be granted; and, pursuant to Fed.R.Civ.P. 65, an order that the trial of the action on the merits be advanced and consolidated with the hearing on the Verified Complaint;

    (c)      An Order granting an interpreter for the proceedings.

    (d)      A final judgment in Petitioner's favor establishing that the Child shall be returned to Venezuela;

    (e)      An Order that the Child be placed in the immediate custody of the Petitioner that will reside with his uncle Juna Carlos Eman Naranjo, at 737 NW 243rd Terrace, Newberry, Florida 32669.

    (f)      An order providing the authorization for the Child to travel to Venezuela in the accompaniment of Petitioner, Danhoe Medina.

    (g)      An order requiring that Respondent pay Petitioner's expenses and costs, including transportation and travel accommodation expenses, under 42 U.S.C. §11607; and

## INTENTIONAL LEFT BLANK

(h)      For any such further relief as may be just and appropriate under the circumstances of this case.

## VERIFICATION AND DECLARATION

I am the Petitioner in the above-entitled matter. I have read the Petition, the allegations are true of my own knowledge, except for matters stated upon information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

I further declare that the allegations in the Petition were verbally translated to me in my native language of Spanish.

Executed this _7_ day of _February_ 2023 in Orange County, Florida, United States of America.

DANHOE ALEJANDRO MEDINA LUGO

STATE OF _Florida_         )
                           )
COUNTY OF _Orange_         )

**SWORN TO AND SUBSCRIBED** before me, this _7_ day of _February_, _2023_, by _Danhoe A. Medina_ who is personally known to me or who has produced a _Venezuelan passport_ #16564 134189 as identification.

NOTARY PUBLIC

Carmelina Marin

[Print, type or stamp commissioned name of notary or deputy clerk.]

CARMELINA MARIN
Notary Public-State of Florida
Commission # HH 99685
My Commission Expires
June 25, 2025

Respectfully submitted this __7__ day of __February__ 2023 by:

THE MARIN LAW FIRM, P.A.

Carmelina Marin, Esq.
Florida Bar No.: 0548871
Attorney for Plaintiff/Petitioner
6900 Tavistock Lakes Blvd., Ste. #400
Orlando, Florida 32825
Telephone: 407-207-1902
Email: contact@themarinlawfirm.com