### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DANHOE ALEJANDRO MEDINA LUGO,**

                 **Petitioner,**

**v.**                                            **Case No: 6:23-cv-232-WWB-DCI**

**MARIA MILAGROS RAMIREZ PADILLA,**

                 **Respondent.**

_____

### REPORT AND RECOMMENDATION

**I.**      **Background**

This cause comes before the undersigned on Petitioner's Verified Complaint and Petition for Return of a Minor Child to Venezuela. Doc. 1 (the Petition). Petitioner filed the Petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the Convention) and the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001 *et seq.* Respondent filed an answer to the Petition. Doc. 32. On February 14, 2023, the Court referred this case to the undersigned to conduct an evidentiary hearing and to issue a report and recommendation on the Petition. Doc. 17. On February 24, 2023, the undersigned conducted a status conference for the evidentiary hearing. Doc. 28. The undersigned set the evidentiary hearing to be held on March 9–10, 2023. *Id.* At the direction of the undersigned, the parties submitted pre-hearing briefs addressing the legal issues. Docs. 47, 48.

The undersigned conducted the evidentiary hearing on March 9, 10, and 13, 2023. The parties each presented testimony through various witnesses and the undersigned also admitted into evidence several exhibits submitted by the parties. At the conclusion of the evidentiary hearing,

in lieu of taking closing argument, the undersigned directed the parties to submit post-hearing briefs tying together the admitted evidence and the various legal issues in dispute in this case. The parties submitted their respective post-hearing briefs on March 19, 2023. Docs. 81, 83. Having considered the evidence of record and the parties' briefing, and being fully advised otherwise, the undersigned respectfully recommends, for the reasons set forth herein, that the Petition (Doc. 1) be **DENIED**.

## II.      Background of the Evidence

During the evidentiary hearing the undersigned admitted a number of exhibits submitted by the parties as well as testimony from the following witnesses: Petitioner; Viviana Hernandez; Abdelkrin Salomon; Luis Padilla; Gonzalo Ivan Padilla; Rafaela Davila Raggio; Arnaldo Cabrera; Respondent; Francisco Symphorien-Saavedra; Carine A. Rose Hernandez; Kathryn Michele Krajewski; Melany Johnston; Tibisay Ocampo Mendoza; Gwenn Carter; Mereny Quintana; Ollyvice Andina Lugo de Medina; and Rafael Haros, Jr.

The undersigned addresses the relevant exhibits and testimony admitted[1] into evidence in analyzing the issues remaining in dispute.[2]

---

[1] The undersigned ruled on a handful of hearsay objections during the evidentiary hearing, but otherwise all testimony was admitted into evidence without hearsay objections. Further, the parties stipulated that almost all the exhibits were admissible, with Petitioner's Rebuttal Exhibit 5 being the only exhibit excluded following a hearsay objection.

[2] At least two issues that were in dispute at the hearing were dropped or conceded in the post-trial briefs. By failing to provide argument or evidence, Respondent conceded that Petitioner met the second element of Petitioner's prima facie case and abandoned her assertion of the affirmative defense related to grave risk of harm. That said, voluminous evidence—including exhibits and a considerable amount of testimony—was admitted regarding these issues during the evidentiary hearing. But because those issues are no longer in dispute, the undersigned will not address the evidence regarding these issues unless it is otherwise relevant.

### III.     Discussion

#### a.  Prima Facie Case

Petitioner here must prove "by a preponderance of the evidence, that [his] child was wrongfully removed or retained within the meaning of the Convention." *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020) (citation omitted).  To establish a prima facie case of wrongful removal or retention under the Convention, Petitioner must prove: (1) that the child was a habitual resident of Venezuela immediately before his retention in the United States; (2) that Respondent's retention breached Petitioner's custody rights under Venezuelan law; and (3) that Petitioner had been exercising his custody rights at the time of retention.  *See id*.

At the beginning of the hearing, the parties stated that they had stipulated that the first and third elements of Petitioner's prima facie case were met, but Respondent disputed the second element.  At the end of the hearing, the undersigned informed the parties that they must submit post-hearing briefs regarding any issue that remained in dispute and that any argument not made in the post-hearing brief would be deemed waived.  In her post-hearing brief, Respondent did not dispute that Petitioner had met the second element of his prima facie case.  Accordingly, and considering the evidence presented at the hearing, the undersigned finds that it is undisputed that Respondent's retention breached Petitioner's custody rights under Venezuelan law and, thus, that Petitioner has satisfied all three elements of his prima facie case.

The undersigned now turns to Respondent's affirmative defenses that are in dispute: the acquiescence defense; the consent defense; and the well-settled defense.[3]

#### b.  Acquiescence and Consent

---

[3] Respondent also originally asserted the grave risk of harm defense, but she offered no argument in support of this defense in her post-hearing brief.  Accordingly, the undersigned finds that she has abandoned this affirmative defense.

If Petitioner establishes a prima facie case of wrongful removal or retention, he is entitled to have the child returned unless Respondent can establish one of several enumerated affirmative defenses. *Berenguela-Alvarado*, 950 F.3d at 1358. The affirmative defenses should be "construed narrowly[.]" *Id*. at 1358 (citation omitted).

The consent defense requires Respondent to prove by a preponderance of the evidence that Petitioner "consented to . . . the removal or retention." *Id.* at 1359 (quoting Hague Convention, art. 13(a); citing 22 U.S.C. § 9003(e)(2)). "The petitioning parent's consent needn't be formal, but 'it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country.'" *Id*. (citing *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)). "The focus of the court's inquiry should be on the petitioning parent's 'subjective intent,' and should take into account '[t]he nature and scope of the petitioner's consent, and any conditions or limitations' on that consent." *Id*. In sum, Respondent must prove by a preponderance that Petitioner actually, subjectively intended to allow the child to leave and remain in the United States. *Id*. at 1360.

"Whereas the consent defense concerns the petitioner's conduct before the contested removal or retention, the acquiescence defense concerns whether the petitioner subsequently agreed to or accepted the removal or retention." *Padilla v. Troxell*, 850 F.3d 168, 175 (4th Cir. 2017) (citations omitted). "[T]o find acquiescence [courts] look to evidence such as testimony in a judicial proceeding, a convincing renunciation of rights, or a consistent attitude over a significant period of time." *Id.* at 176.

The evidence submitted on these defenses is almost entirely of the "he said, she said" variety. Respondent alleges that Petitioner consented to the child (hereinafter, "M") being taken to the United States and remaining here, while Petitioner denies giving his consent. Based on the

undersigned's observation of Respondent's demeanor during testimony and the overall consistency of her testimony, the undersigned finds her testimony credible and sincere.

Regarding Petitioner's credibility, on direct examination Petitioner stated that Respondent had not discussed any of M's medical needs with Petitioner.  Doc. 65 at 8.  But on cross examination, Petitioner admitted that Respondent had communicated about M's medical care and treatment with Petitioner, and moreover, Petitioner also did not ask about M's medical care.  *Id.* at 52.  Petitioner also asserted that he did not know M's whereabouts.  Doc. 65 at 18.  But on direct examination, Petitioner's own cousin and witness, Mr. Salomon, testified that he informed Petitioner's father[4] of M's whereabouts as early as January 2022.  Doc. 71 at 5.  Most importantly, Petitioner, who currently has custody of M, testified that M had been to school every day except for one day when Petitioner took M to visit a theme park.  Doc. 65 at 61.  However, later during the hearing, there was testimony that M had not been at school on either March 9, 2023 (the day Petitioner testified) or March 10, 2023.  Petitioner also admitted that M had not been at school on both of those days.  Based on the undersigned's observation of Petitioner's demeanor during testimony, as well as the above inconsistencies in Petitioner's testimony, the undersigned finds Petitioner's testimony less than fully credible.

That being said, the undersigned does not find that Respondent has carried her burden to establish that Petitioner subjectively intended to allow M to leave Venezuela and remain in the United States.  Nor has Respondent carried her burden to establish that Petitioner subsequently acquiesced in M's removal.  Respondent has established that she and Petitioner had discussed M leaving and that Petitioner was therefore aware of Respondent's plan to leave.  Doc. 69 at 6–8.

---

[4] Mr. Salomon was informed that Petitioner and his father were looking for M's whereabouts.  Doc. 71 at 5.  Petitioner and his father suspected that M was in Sanford, Florida, where Mr. Salomon lived, so Mr. Salomon kept an eye out for M.  *Id.*

But awareness does not equal consent.  Further, Petitioner's actions taken after M was removed evince that Petitioner did not acquiesce or consent to M's removal; Petitioner consistently voiced his opposition in WhatsApp messages and filed petitions with various authorities seeking M's return.  Docs. 78-9; 78-10; 78-16; *see Padilla*, 850 F.3d at 176 ("[A] petitioner's conduct after removal can further inform whether she consented at the time of removal.").

The undersigned finds that Respondent has not established Petitioner's consent by a preponderance of the evidence.  The undersigned also finds that Respondent has not established Petitioner's subsequent acquiescence by a preponderance of the evidence.  Accordingly, the undersigned rejects these affirmative defenses.

### c.  Well-Settled Defense

"Under Article 12, if a Hague petition is filed more than one year after the child was wrongfully removed, a Court need not order his or her return if it is demonstrated that the child is now settled in its new environment." *Da Silva v. Vieira*, 6:20-CV-1301-ORL-37GJK, 2020 WL 5652710, at *5 (M.D. Fla. Sept. 23, 2020) (internal quotation marks omitted).  M was wrongfully removed[5] from Venezuela on November 17, 2021, and the Petition was filed on February 9, 2023.  Doc. 1.  Therefore, more than a year passed between M's wrongful removal and the Petition's filing, so the well-settled defense may apply here.  *See Bejarno v. Jimenez*, 2020 WL 4188212, at *7 (D.N.J. July 21, 2020) ("Because Petitioner did not file his petition until August 30, 2019 – sixteen months after the removal – the proceedings in this matter were not 'commenced' under the

---

[5] In his post-hearing brief, it appears that Petitioner for the first time asserts that the date of M's wrongful removal was May 2022.  Doc. 83 at 4.  This contradicts Petitioner's prior representations in both the Petition and the pre-hearing brief that M was wrongfully removed in November 2021.  Docs. 1 at 11–12; 47 at 2.  To the extent Petitioner now asserts that May 2022 is the relevant date for the running of the 1-year period, Petitioner cites no authority for that assertion and thus, the undersigned rejects it.

Convention within one year of the child's wrongful removal."); *see also Fernandez v. Bailey*, 909 F.3d 353, 359 (11th Cir. 2018) ("[U]nder the Convention, if too much time has passed between the abduction and the filing, the right of return becomes circumscribed.") (citing *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5, 134 S. Ct. 1224 (2014)).

The well-settled defense requires Respondent to prove by a preponderance of the evidence that the child is now well-settled. *Da Silva*, 2020 WL 5652710, at *5 (citing *Fernandez*, 909 F.3d at 361). "In this circuit, a child is well settled for purposes of the Hague Convention 'when . . . the child has significant connections to their new home that indicate that the child has developed a stable, permanent, and nontransitory life in their new country to such a degree that return would be to the child's detriment.'" *Romero v. Bahamonde*, 857 F. App'x 576, 585 (11th Cir. 2021) (citing *Fernandez*, 909 F.3d at 361). Generally, "[c]ourts look to how frequently children move around within their new country, whether they attend extracurricular and community activities, and whether they regularly attend school when determining whether they are well-settled." *Id.* (citing *Lozano*, 572 U.S. at 17 (collecting cases)).

In *Romero*, a panel of the Eleventh Circuit found that the following factors showed the children were well-settled: (1) the children were enrolled in school; (2) the children had only moved schools once in three years; (3) the children were involved in extracurricular activities; (4) the children had many friends; (5) the children regularly saw family members; (6) the children lived in a stable home; and (7) even though the children did not have lawful immigration status, the children were not under threat of immediate removal by ICE. *Id.* at 585–86. The undersigned turns to the well-settled factors, as briefed by the parties. [6]

---

[6] Other courts have considered a similar, non-exhaustive list of factors, such as:

### i. Age of M

M was 6 years old when the Petition was filed, and "6 years old . . . is old enough to form relationships and emotional ties to the community." *Amdamaskal v. Amdamaskal*, 2018 WL 3360767, at *5 (D. Minn. July 10, 2018); *see also Bejarno*, 2020 WL 4188212, at *8 (finding age of 6-year-old child weighed in favor of settlement). Beyond being old enough to be able to form relationships and emotional ties to the community, as will be discussed in the other factors, the evidence supports that M has actually formed many meaningful relationships with friends and family in this community. Further, Respondent and M lived in the United States—specifically in Sanford, Florida—for around 15 months before the Petition was filed, so M has spent over a fifth of his life here. *Cf. Amdamaskal*, 2018 WL 3360767, at *5 ("They had also been here for over 20 months—over a fourth of L.'s life[.]").

Accordingly, the undersigned finds that this factor weighs in favor of finding that M is well-settled.

### ii. Stability of Residence

Since arriving in the United States, Respondent and M have lived in Sanford with Respondent's husband (M's stepfather) and Respondent's mother (M's maternal grandmother).

---

(1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the parent's employment or other means of support; (6) whether the child has friends and relatives in the area; (7) to what extent the child has maintained ties to the country of habitual residence; (8) the level of parental involvement in the child's life; (9) active measures to conceal the child's whereabouts (and the possibility of criminal prosecution related thereto); and, (10) the immigration status of the child and parent.

*Bejarno*, 2020 WL 4188212, at *8.

Respondent testified that they lived in her deceased uncle's home until August 2022, when they moved into their current apartment.  Doc. 69 at 17.  M has his own bedroom at this apartment.  *Id.*  Respondent is on the lease for the apartment along with Patricia Padilla, who is a guarantor for the apartment.  *Id.* at 19.  The rent and utilities for the apartment have been timely paid.  Doc. 79-5.  Further, Ms. Krajewski, Respondent and M's cousin, testified that in the event Respondent and M needed support, Respondent and M would be welcome to stay in Ms. Krajewski's home.  Doc. 67 at 64.

Based on the undersigned's observation of Respondent's and Ms. Krajewski's demeanor during testimony and the consistency of their testimony, the undersigned finds both of their testimony to be credible and sincere.  M lives in a stable home with family members and they have only changed residence once since arriving in the United States.  This is not a situation where M has a transitory, unstable residence.  *Cf. Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1363 (M.D. Fla. 2002) ("Since their arrival in Florida on January 19, 2000 [roughly eighteen months], the children have lived in seven different locations, including a domestic violence shelter.  The longest they have spent at a single location has been approximately seven months.").

Accordingly, the undersigned finds that this factor weighs in favor of finding that M is well-settled.

### iii.  School

Petitioner does not dispute that M attends school regularly.  Doc. 83 at 15.  However, Petitioner argues that because M's school, Pine Crest Elementary, has a "D" rating M is receiving a subpar education.  *Id.*

M's voluntary pre-school (VPK) teacher, Ms. Hernandez, testified that M started the VPK program on December 8, 2021.  Doc. 67 at 25.  M did not speak English when he started VPK, *id.*

at 26, but by the end of the school year M was able to converse with his teacher and fellow students in English, *id.*  Ms. Krajewski, who works as a speech-language pathologist in the Seminole County school system (which Pine Crest Elementary is a part of), also testified regarding M's schooling.  Ms. Krajewski testified that M's English skills were so proficient that he was not offered ESOL—education for speakers of other languages—which is a service offered to students who do not know enough English to be successful in the classroom.  *Id.* at 58–59.  Perhaps most notably, M acts as a classroom translator for his fellow students.  *Id.* at 59.  M's kindergarten teacher, Ms. Johnston, testified that:

> [M] is bilingual.  [M] speaks and reads English and Spanish very well.  He helps.  He's somewhat of a peer tutor that when I'm giving an assignment and the students go off to complete some work independently, [M] has allowed students to come sit near him, and [M] explains in Spanish when our ESOL teacher is not available.

*Id.* at 83.

M has also been successful in school, he either met or exceeded expectations in his VPK end-of-year assessment.  *Id.* at 27–31.  M is also in the "enrichment" program and is being tested for the "gifted" program.  *Id.* at 63, 83–84.  While Petitioner alleges that the school's "D" rating means that M is receiving a subpar education,[7] the undersigned notes that Ms. Johnston testified that this rating may not adequately account for the multitude of changes the school has recently undergone, such as the school becoming a magnet school, the change in administration, and the hiring of new teachers, including Ms. Johnston.  *Id.* at 81.

Based on the undersigned's observation of Ms. Hernandez, Ms. Johnston, and Ms. Krajewski's demeanor during testimony and the consistency of their testimony, the undersigned

---

[7] It also bears noting that a school's rating does not prevent a student from excelling; Ms. Hernandez testified that her daughter, who recently graduated from the Massachusetts Institute of Technology, also went to a "D" school.  Doc. 67 at 28.

finds Ms. Hernandez, Ms. Johnston, and Ms. Krajewski's testimony credible and sincere. And regardless of M's school's rating, M attends school regularly, and he is undisputedly doing well in school. Indeed, though the parties repeatedly insisted on propounding evidence concerning the quality of the school or its rating, the undersigned finds that such evidence has little—if any—relevance to the question at hand.

Accordingly, the undersigned finds that this factor weighs in favor of finding M well-settled.

### iv.  Extracurricular Activities

Respondent testified that she and M are members of All Souls Catholic Church and that she and M regularly attend church. Doc. 69 at 29. In contrast, Petitioner testified that M told him that M had only been to church once since coming to the United States. Doc. 65 at 54. Based on the undersigned's observation of Respondent's demeanor during testimony and the consistency of her testimony, the undersigned finds her testimony credible and sincere. Based on the undersigned's observation of Petitioner's demeanor during testimony, as well as the inconsistency of Petitioner's testimony as previously noted, the undersigned finds Petitioner's testimony less than fully credible. Further, it bears noting that Respondent's testimony is based on firsthand knowledge, while Petitioner's testimony is—at best—secondhand knowledge based on what M allegedly told him.[8]  The undersigned therefore finds that the evidence supports Respondent's assertion that M attends church regularly.

Ms. Ocampo, one of Respondent's friends, testified that she sees Respondent and M one to three times a month. Doc. 67 at 98. Ms. Ocampo met Respondent and M through the

---

[8] While Petitioner's testimony regarding what M told him was admitted into evidence without objection, the undersigned does consider its hearsay nature in weighing the competing testimony.

Venezolanos en Sanford organization, which is a local Venezuelan community group. *Id.* at 96. Ms. Ocampo often sees M and his family at Venezolanos en Sanford community events, which includes gatherings to maintain a public park. *Id.* at 97. Based on the undersigned's observation of Ms. Ocampo's demeanor during testimony and the consistency of her testimony, the undersigned finds Ms. Ocampo's testimony credible and sincere.

Accordingly, the undersigned finds that this factor weighs in favor of finding M to be well-settled.

### v. Financial Stability

Respondent testified that she receives income from rental properties in Venezuela. Doc. 69 at 19–20. Respondent also testified that her husband provides financial support to her and M through his job as a solar panel installer, making roughly $6,000 per month. *Id.* Respondent has also worked various odd jobs, such as house cleaning and dog walking. *Id.* at 19. Though Respondent and her husband do not currently have work permits, they have both applied for work permits. *Id.* at 20, 48–49. As noted previously, the rent on the apartment Respondent and M live at has been timely paid and the lease is guaranteed by a third party. Doc. 79-5.

It is undisputed that M receives free or reduced lunch at school. Doc. 76 at 17. Petitioner asserts that because M receives free or reduced lunch, Respondent is either fraudulently receiving those benefits or the income she is receiving is considerably lower than she claims. However, the absence of any evidence as to what income levels qualify for free or reduced lunch is fatal to Petitioner's argument.[9]

---

[9] In his rebuttal case, Petitioner did attempt to introduce evidence of the free or reduced lunch policy through his mother's testimony, but her testimony on this point was excluded as hearsay and Petitioner laid no other foundation for her to testify on the matter.

Petitioner also asserts that M is not financially stable because much of the family's income comes from Respondent's husband, who has no legal obligation to support M. Doc. 69 at 57. However, despite not having any legal obligation to support M, Respondent's husband has supported both Respondent and M. Respondent also offered testimony that M and her husband are close and that Respondent and her husband have a solid marriage. *Id.* at 5, 20–21. And in the event Respondent and her husband were to separate, Respondent testified that she would find a job to support M. *Id.* at 21. So, the undersigned is not persuaded by Petitioner's argument here.

Based on the undersigned's observation of Respondent's demeanor during testimony and the consistency of her testimony, the undersigned finds Respondent's testimony credible and sincere. Thus, the undersigned finds that Respondent, and by extension M, are financially stable.

Accordingly, the undersigned finds that this factor weighs in favor of finding M well-settled.

### vi.   Friends and Family

Ms. Ocampo testified that she sees Respondent and M one to three times a month. Doc. 67 at 98. M plays with Ms. Ocampo's rescue dog and M watches Ms. Ocampo's son's baseball games. *Id.* Ms. Ocampo has also given M gift cards to a bookstore to support M's love of reading. *Id.* at 99. Respondent and M's teachers testified that M has made many friends at school. Docs. 67 at 34, 83; 69 at 33. Respondent also testified that M sees his godmother and her children around once or twice a month. Doc. 69 at 33–34.

Ms. Krajewski testified that she sees M two to three times a week. Doc. 67 at 37. Ms. Krajewski also testified that her brother's family sees M at least twice a month. *Id.* at 40. Ms. Krajewski also went through an extensive exhibit of pictures, which showcased M spending time with various family members in Florida. Docs. 79-10; 79-11. This exhibit included pictures of M

celebrating traditional American holidays with his family, such as Thanksgiving, Christmas, and the Fourth of July.  *Id.*  This exhibit also included pictures of M visiting various places with his family, such as theme parks.  *Id.*

Petitioner asserts that M does not have close family relationships in this community, primarily because M's local family members are "distant relations."  Doc. 83 at 16.  But the undersigned is not persuaded that relationships developed between extended family members are inherently less meaningful and fulfilling than those relationships formed between "close" family members, and Petitioner cites no authority to the contrary.  Moreover, this argument is unpersuasive given the substantial amount of evidence Respondent has submitted, which evinces the bonds M has formed with his many local family members in Florida.

Based on the undersigned's observation of Ms. Krajewski's and Ms. Ocampo's demeanor during testimony and the consistency of their testimony, the undersigned finds both Ms. Krajewski and Ms. Ocampo's testimony credible and sincere.

Accordingly, the undersigned finds that this factor weighs in favor of finding M well-settled.

### vii.  Parental Involvement

Respondent testified that she has been M's primary caregiver since M was born.  Doc. 69 at 23.  Respondent also testified that, prior to these proceedings, she and M had not been apart for more than a week at a time.  *Id.* at 24.  Respondent also testified about M's daily routine, and specifically Respondent's heavy involvement in M's daily routine.  *Id.* at 27–28.  Both of M's teachers testified that Respondent is actively involved in M's schooling.  Doc. 67 at 28, 87, 90–91.  Respondent has also ensured that M has health insurance in Florida and that M receives adequate medical care in Florida, including vaccinations and routine checkups.  Docs. 79-7; 79-8.

Based on the undersigned's observation of M's teachers' and Respondent's demeanor during testimony and the consistency of their testimony, the undersigned finds their testimony credible and sincere.

Petitioner contends that this factor weighs against finding M well-settled because Petitioner is not currently involved in M's upbringing. However, the focus of this factor is more appropriately focused on the non-petitioning parent's involvement in the child's life. *See Castellanos Monzon v. De La Roca*, 2016 WL 1337261, at *14 (D.N.J. Apr. 5, 2016) (considering the respondent's parental involvement in evaluating this factor). So, the undersigned is unpersuaded by this argument.

Accordingly, the undersigned finds that this factor weighs in favor of finding M well-settled.

### viii. Ties to Venezuela

Petitioner asserts that Respondent has prevented M from maintaining ties with his family in Venezuela, which Petitioner asserts weighs against finding M well-settled. However, the lack of ties to Venezuela—which does not appear to be in dispute—may actually support finding M well-settled in the United States. *See Ramirez v. Buyauskas*, 2012 WL 606746, at *18 (E.D. Penn. Feb. 24, 2012) (finding children well-settled where "[t]here was no evidence that the children miss living in Mexico or any aspect of living there.").

Regardless, because M's lack of ties to Venezuela appears to be attributable to Respondent and not to M, the undersigned finds that this factor is neutral. *See Castellanos Monzon*, 2016 WL 1337261, at *14 ("However, since it was Respondent's actions, and not H.C.'s actions, which resulted in H.C. having fewer ties with Guatemala, this Court finds Factor Seven is neutral in the Court's analysis.") (citation omitted).

### ix. Immigration Status

There appears to be no dispute that Respondent's entry in the United States was unauthorized.[10]  However, Respondent, her husband, and M have filed a petition for asylum in the United States.  Mr. Symphorien-Saavedra, a local board-certified immigration law attorney with fifteen years of experience, testified on behalf of Respondent.  Doc. 67 at 3.  Mr. Symphorien-Saavedra has handled hundreds of asylum petitions similar to Respondent's.  *Id.* at 4.  Mr. Symphorien-Saavedra reviewed Respondent's asylum petition and opined that the merits of the asylum petition are "substantially strong."  *Id.* at 5.  Mr. Symphorien-Saavedra testified that Respondent, her husband, and M are not at risk of being deported for at least five years given the current backlog of immigration cases in this area.  *Id.*  Notably, Mr. Symphorien-Saavedra stated that he has not seen a Venezuelan national deported for the past seven years, a fact he attributed to the current relations between the United States government and the Venezuelan government.  *Id.* at 9.  When pressed on cross examination, Mr. Symphorien-Saavedra also stated that he had handled three asylum petitions for Venezuelan nationals in the past two years—all three petitions were granted.  *Id.* at 19.  Finally, the undersigned notes that Mr. Symphorien-Saavedra testified pro bono, and Petitioner did not rebut Mr. Symphorien-Saavedra's testimony.[11]  *Id.* at 10–11.

---

[10] In the Petition, Petitioner alleged that Respondent utilized "persons affiliated with gangs, human traffickers, sex workers, and drug smugglers" in order to gain access to the United States.  Doc. 1 at 17.  Petitioner also alleged that Respondent paid known criminals to help her cross the United States border and come to Florida, which crossing allegedly included M being dragged across a river and being exposed to various maladies.  *Id.* at 17–19.  Petitioner did not produce any evidence supporting any of these allegations at the hearing.  Accordingly, the undersigned does not credit these allegations.

[11] Petitioner attempted to offer an immigration attorney from Texas to rebut Mr. Symphorien-Saavedra's testimony.  However, that attorney had not reviewed Respondent's asylum petition and had only been a practicing lawyer for sixteen months.  Ultimately, almost no testimony was

Based the undersigned's observation of Mr. Symphorien-Saavedra's demeanor during testimony, the consistency of his testimony, and his qualifications, the undersigned finds his testimony credible and persuasive.  However, ultimately, Respondent's (and by extension, M's) immigration status is uncertain.

Considering the uncertain immigration status of Respondent and M, the undersigned finds that this factor is neutral.[12]

### x.  Conclusion

Upon weighing the totality of the foregoing factors[13]—none of which weigh in favor of a finding that the child is ***not*** well-settled—the undersigned finds that Respondent has carried her burden of proving that M is well-settled by a preponderance of the evidence.  Accordingly, the undersigned finds that M is well-settled in this community.

### d.  Discretionary Considerations

But "a court can order the return of a wrongfully removed child who is settled in his new environment."  *Fernandez*, 909 F.3d at 362.  "Article 18 [of the Hague Convention] states that '[t]he provisions of this Chapter [Chapter 3, which includes Article 12] do not limit the power of

---

admitted from that witness and Petitioner does not argue in his post-hearing brief that Mr. Symphorien-Saavedra's testimony was rebutted in any way.

[12] The undersigned presents no opinion on the merits of Respondent's asylum claim.  The undersigned also does not find that Respondent is immune to deportation.  Whether removal proceedings should be initiated against Respondent is solely within the discretion of the Executive Branch.

[13] Respondent also asserts that M prefers to remain in the United States and that M's preference weighs in favor of finding M well-settled.  M did not testify.  The only testimony regarding M's preference came from Respondent during her cross-examination in response to a direct—and perhaps ill-advised—question from Petitioner's counsel.  However, Respondent cited no authority for the proposition that a six-year-old child's preferences should be considered here, and the undersigned does not consider it.  Yet, the testimony came into the record without objection.

a judicial or administrative authority to order the return of a child at any time,' and the circuit courts which have addressed the issue have all held that this language, either standing alone or when read in conjunction with another provision (Article 12, for instance), grants courts the discretion to order the return of a child despite the existence of an exception to return." *Id.* (all editing marks original) (citations omitted). However, "a district court ordering the return of a settled child should be an infrequent occurrence, so as not to swallow the text of Article 12's stated exception." *Id.* at 363.

"Concealing a child can forestall a well-settled defense." *Alvarez Romero v. Bahamonde*, 2020 WL 8459278, at *13 (M.D. Ga. Nov. 19, 2020) (citing *Lozano*, 572 U.S. at 17). However, concealment measures often negate the well-settled factors (i.e., they weigh against finding various well-settled factors to be met), as opposed to being an independent basis for courts to return well-settled children. For instance, the United States Supreme Court has observed that:

> American courts have found as a factual matter that steps taken to promote concealment can also prevent the stable attachments that make a child "settled." *See, e.g., Mendez Lynch v. Mendez Lynch*, 220 F.Supp.2d 1347, 1363–1364 (M.D.Fla.2002) (children not settled when they "lived in seven different locations" in 18 months); *Wigley v. Hares*, 82 So.3d 932, 942 (Fla.App.2011) ("The mother purposely kept him out of all community activities, sports, and even church to avoid detection by the father"); *In re Coffield*, 96 Ohio App.3d 52, 58, 644 N.E.2d 662, 666 (1994) (child not settled when the abducting parent "was attempting to hide [child's] identity" by withholding child from school and other organized activities). Other signatories to the Hague Convention have likewise recognized that concealment may be taken into account in the factual determination whether the child is settled. *See, e.g., Cannon*, [2005] 1 W.L.R., ¶¶ 52–61. *See also Kubera*, 3 B.C.L.R. (5th), ¶ 47, 317 D.L.R. (4th), ¶ 47; A.C. v. P.C., [2005] HKEC 839, ¶ 39, 2005 WL 836263, ¶ 39.

*Lozano*, 572 U.S. at 17.

Here, as discussed previously, the undersigned finds that M is well-settled in this community. Accordingly, the undersigned finds that Respondent's alleged concealment measures have not negated the well-settled factors. To be sure, Respondent has not continuously moved

locations to hide M from detection (which may have negated the stability of residence factor), *see Mendez Lynch*, 220 F. Supp. 2d at 1363; nor has Respondent kept M from attending school regularly (which may have negated the school factor), *see In re Coffield*, 644 N.E.2d at 666; nor has Respondent kept M from attending church and other community activities (which may have negated the church and extracurricular activities factors), *see id.*; *see also Wigley*, 82 So.3d at 942. And, for the most part, Petitioner does not even allege that Respondent has taken those typical concealment measures.[14]

Further, the undersigned finds that the allegations of concealment that Petitioner does make are without merit.  Petitioner's cousin, Mr. Salomon, whom Petitioner offered as a witness, testified that he saw M at M's then-current address in January 2022.  Doc. 71 at 5.  Mr. Salomon informed Petitioner's father of M's location that same month.  *Id.*  Mr. Salomon also saw M at his current apartment in October 2022 and relayed that information to Petitioner's father.  *Id.* at 7.  So, Petitioner knew of M's location as early as January 2022—two months after M arrived in the United States.  Further, Respondent disclosed her (and M's) address in May 2022 in response to a filing made by Petitioner.  Doc. 78-9 at 9.  Finally, Respondent testified that she and M have met Petitioner's cousin on several occasions and that Respondent and M even attended Petitioner's cousin's wedding.  Doc. 69 at 31.  While in August 2022 Respondent did cut off contact with Petitioner by blocking him on WhatsApp, Doc. 69 at 46–47, the undersigned finds that this alone does not support a finding that Respondent was concealing M's whereabouts, especially given the absence of typical active-concealment measures, the actions Respondent took that were

---

[14] Petitioner does allege that M did not attend church regularly, but as discussed, the undersigned finds that allegation is without merit.

inconsistent with concealing M, and the fact that Petitioner had actual knowledge[15] of where M was located as early as January 2022. Accordingly, the undersigned finds that Respondent did not conceal M's whereabouts from Petitioner.

Petitioner has not identified any other sufficient basis for the Court to exercise its discretion to return a well-settled child. *See Fernandez*, 909 F.3d at 363 ("[A] district court ordering the return of a settled child should be an infrequent occurrence, so as not to swallow the text of Article 12's stated exception [i.e., the well-settled defense].").  Petitioner argues that not returning M would thwart the aims of the Convention, emphasizing that Respondent wrongfully removed the child from Venezuela. Doc. 83 at 23. But if courts were to return well-settled children based only on the removal being wrongful, the well-settled defense would be rendered a nullity—the well-settled defense is a defense to wrongful removals. Otherwise, Petitioner has not identified any exceptional—or in the *Fernandez* court's words, "unique"—circumstances that would justify returning a well-settled child. *Fernandez*, 909 F.3d at 363. For instance, in *Fernandez* the court found the case unique because: this was the second time the mother wrongfully removed the children from Panama (the first time, the children were returned via a petition under the Convention); the father had committed a felony as a juvenile in the United States, which meant he could not enter the United States to participate in any custody proceedings here; and at the time of removal, the Panamanian courts were in the midst of deciding over ten custody-related matters. *See id.* at 364–365. By contrast, here, this is the first time Respondent wrongfully removed M and Petitioner is not prohibited from coming to the United States to litigate any custody issues— indeed, Petitioner currently has a visa that is valid until 2026. Doc. 65 at 17. Further, while there

---

[15] Even before actually knowing Respondent and M's address, Petitioner suspected that M was in Sanford, Florida because Respondent's mother lived here.  Doc. 65 at 28.

might be some custody issues now pending before the Venezuelan courts, the record does not support a conclusion that this case is like *Fernandez* on this issue. Overall, the facts of this case are relatively ordinary as far as Convention proceedings are concerned.

Accordingly, the undersigned finds that this is not a "unique" case justifying the discretionary return of a well-settled child. *See Fernandez*, 909 F.3d at 363.

## IV.    Conclusion

The undersigned does not condone Respondent's removal of M from Venezuela, nor does the undersigned find that Petitioner has acted wrongfully in any manner. But under the Convention, the undersigned is not tasked with determining the fairest outcome for the parents. Nor is the undersigned tasked with determining the ideal outcome for M; there is no ideal outcome here.

But over a year has passed since M was removed from Venezuela, and M is now a well-settled child. M has spent a substantial portion of his life in this community, setting down roots all the while. That M's original removal was wrongful does not justify yet another uprooting, and the undersigned finds no other discretionary basis to order the return of this well-settled child. *See Fernandez*, 909 F.3d at 363 ("[A] district court ordering the return of a settled child should be an infrequent occurrence, so as not to swallow the text of Article 12's stated exception.").

As the United States Supreme Court has explained, "the expiration of the 1–year period opens the door to consideration of a third party's interests, i.e., the child's interest in settlement." *Lozano*, 572 U.S. at 15. "[O]f course, [] the Convention reflects a design to discourage child abduction. But the Convention does not pursue that goal at any cost. The child's interest in choosing to remain, Art. 13, or in avoiding physical or psychological harm, Art. 13(b), may overcome the return remedy. The same is true of the child's interest in settlement." *Id.* at 16. This

is a case where M's interest in being settled outweighs the return remedy; M "should not be made to suffer for the sake of general deterrence of the evil of child abduction world wide." *Id.* at 16–17 (quoting *In re M*, [2008] 1 A.C. 1288, 1310 (Eng. 2007) (opinion of Baroness Hale of Richmond)).  To the extent not ordering M to be returned constitutes a boon to Respondent, it is solely a result of the terms of the Convention.

Accordingly, for the foregoing reasons, the undersigned respectfully **Recommends** that the Petition (Doc. 1) be **DENIED**.

## NOTICE TO PARTIES

The party has fourteen days from the date the party is served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. § 636(b)(1)(C).  A party's failure to serve and file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Recommended in Orlando, Florida on March 28, 2023.

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy